# 19-70

*To Be Argued By:*
DAVID E. NOVICK

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 19-70

_____

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

WAYNE BURSEY,

*Defendant,*

DANIEL CARPENTER,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

### BRIEF FOR THE UNITED STATES OF AMERICA

JOHN H. DURHAM
*United States Attorney*
*District of Connecticut*
157 Church Street, 25th Floor
New Haven, Connecticut 06510
(203) 821-3700

DAVID E. NOVICK
NEERAJ N. PATEL
SANDRA S. GLOVER *(of counsel)*
*Assistant United States Attorneys*

# Table of Contents

Table of Authorities ........................................... vii

Statement of Jurisdiction ............................... xix

Statement of Issues Presented for Review ........xx

Preliminary Statement .......................................1

Statement of the Case ........................................3

   A. Procedural history ......................................3

   B. Summary of offense conduct ......................4

Summary of Argument .......................................8

Argument............................................................ 10

I. The district court properly denied Carpenter's motion to dismiss the indictment under the STA ................................................................. 10

   A. Relevant facts .......................................... 10

   B. Governing law and standard of review......................................................... 15

   C. Discussion ................................................ 19

      1. Only 16 countable days elapsed from January 18, 2014 through March 10, 2014...................................................... 19

2. No time elapsed from March 11, 2014
through March 10, 2015 ........................ 23

3. No time elapsed from March 11, 2015
through February 16, 2016 .................. 23

II. The district court correctly denied
Carpenter's motions to suppress .................. 31

A. Relevant facts ........................................... 31

1. The 2010 warrant ................................ 31

2. The 2011 warrant ................................ 33

3. Initial motion to suppress ................... 36

4. Motion for reconsideration .................. 38

B. Governing law and standard of
review ....................................................... 39

1. Reasonable expectation of privacy
(standing) .............................................. 39

2. Particularity and overbreadth ............ 41

3. Good faith ............................................ 46

4. Harmless error ..................................... 48

C. Discussion ................................................ 48

1. Carpenter lacked a reasonable
expectation of privacy .......................... 48

a. 2010 warrant ................................... 49

b. 2011 warrant ................................... 50

2. Both warrants were not overbroad and were sufficiently particular .......... 51

a. 2011 warrant ................................... 52

b. 2010 warrant ................................... 60

c. Carpenter's arguments are unavailing ........................................ 66

3. The agents acted in good faith ............ 70

a. The agents reasonably relied on the warrants ........................................... 71

b. The agents conducted appropriately limited searches ............................... 73

4. Any error was harmless ...................... 77

a. 2010 warrant ................................... 78

b. 2011 warrant ................................... 78

III. The district court arrived at a reasonable estimate of loss ........................................... 79

A. Relevant facts ......................................... 79

1. Insurance company testimony ........... 79

iii

2. Loss calculation .................................. 80

3. Sentencing........................................... 81

B. Governing law and standard of
review ..................................................... 82

C. Discussion............................................... 82

1. The district court's decision
appropriately followed *Binday*........... 83

2. The loss calculation is consistent
with other precedent........................... 83

3. Carpenter's alternative is
foreclosed by *Binday* and
otherwise unsupportable ................... 86

a. The alternative was rejected in
*Binday* ............................................ 86

b. The alternative misunderstands
loss in "right to control" cases ........ 87

c. Carpenter's alternative distorts
the facts of this case......................... 89

d. Carpenter cites a number of
unhelpful cases regarding
proximate cause .............................. 90

4. Any error was harmless....................... 94

iv

IV. The district court properly found that mail and wire fraud counts were within the statute of limitations............................ 95

    A. Relevant facts.......................................... 95

    B. Governing law and standard of review ...................................................... 95

    C. Discussion................................................. 97

V. The district court did not plainly error by finding Carpenter guilty of money laundering and illegal monetary transactions based on transactions involving the Spencer death benefits ......................................................... 103

    A. Relevant facts ........................................ 103

    B. Governing law and standard of review ..................................................... 104

    C. Discussion ............................................. 106

        1. The Spencer death benefits constitute "proceeds" of the fraud ..... 107

        2. Carpenter's challenges are baseless .............................................. 108

v

Conclusion .................................................... 114

Federal Rule of Appellate Procedure 32(g)
Certification

Addendum

vi

# Table of Authorities

Pursuant to "Blue Book" rule 10.7, the Government's citation of cases does not include "certiorari denied" dispositions that are more than two years old

## Cases

*AEI Life LLC v. Lincoln Benefit Life Co.*,
　892 F.3d 126 (2d Cir. 2018)........................... 111

*Andresen v. Maryland*,
　427 U.S. 463 (1976) ....................................... 42

*Blackwatch Trail, Apt. 8, Fairport, N.Y. 14450 v. United States*,
　271 F. App'x 52 (2d Cir. 2008) ................. 44, 67

*Herring v. United States*,
　555 U.S. 135 (2009) ....................................... 46

*Illinois v. Gates*,
　462 U.S. 213 (1983) ....................................... 41

*In Re 650 Fifth Avenue and Related Properties*,
　830 F.3d 66 (2d Cir. 2016)........................ 43, 67

*Katz v. United States*,
　389 U.S. 347 (1967) ....................................... 39

*Kramer v. Lockwood Pension*,
　653 F. Supp. 2d 354
　(S.D.N.Y. 2009) ............................... 90, 111, 112

*Lagow v. United States*,
  159 F.2d 245 (2d Cir. 1946)
  (per curiam)..................................................... 40

*Massachusetts v. Sheppard*,
  468 U.S. 981 (1984) ............................ 46, 47, 72

*Muick v. Glenayre Electronics*,
  280 F.3d 741 (7th Cir. 2002) .................... 41, 50

*National City Trading Corp. v. United States*,
  635 F.2d 1020
  (2d Cir. 1980) .......................... 41, 45, 51, 69, 74

*Paroline v. United States*,
  572 U.S. 434 (2014) ....................................... 90

*Perry v. Ethan Allen, Inc.*,
  115 F.3d 143 (2d Cir. 1997)............................ 48

*Rakas v. Illinois*,
  439 U.S. 128 (1978) ....................................... 39

*Schmuck v. United States*,
  489 U.S. 705 (1989) ....................................... 96

*United States Postal Service v. CEC Services*,
  869 F.2d 184 (2d Cir. 1989)................ 45, 59, 62

*United States v. Abboud*,
  438 F.3d 554 (6th Cir. 2006) .................... 46, 69

*United States v. Adams*,
  625 F.3d 371 (7th Cir. 2010) ............. 16, 17, 24

viii

*United States v. Adejumo*,
  772 F.3d 513 (8th Cir. 2014) .......................... 17

*United States v. Afriyie*,
  No. 17-2444, __ F.3d__,
  2019 WL 2909164 (2d Cir. July 8, 2019) ..... 107

*United States v. Agnew*,
  171 F. App'x 376 (2d Cir. 2006) .................... 94

*United States v. Aguiar*,
  737 F.3d 251 (2d Cir. 2013)..................... 48, 77

*United States v. Angevine*,
  281 F.3d 1130 (10th Cir. 2002) ..................... 41

*United States v. Barnes*,
  159 F.3d 4 (1st Cir. 1998).............................. 22

*United States v. Bazemore*,
  608 F. App'x 207 (5th Cir. 2014).............. 91, 92

*United States v. Bazemore*,
  839 F.3d 379 (5th Cir. 2016)
  (per curiam)............................................... 84, 93

*United States v. Bianco*,
  998 F.2d 1112 (2d Cir. 1993)......................... 73

*United States v. Binday*,
  804 F.3d 558 (2d Cir. 2015)...................*passim*

*United States v. Borker*,
  525 F. App'x 55 (2d Cir. 2013) ...................... 85

ix

*United States v. Bowen*,
689 F. Supp. 2d 675
(S.D.N.Y. 2010) ....................... 45, 62, 66, 69, 72

*United States v. Bradley*,
644 F.3d 1213 (11th Cir. 2011) ..................... 45

*United States v. Breen*,
243 F.3d 591 (2d Cir. 2001).... 16, 24, 25, 26, 27

*United States v. Brien*,
617 F.2d 299 (1st Cir. 1980).......................... 45

*United States v. Britt*,
508 F.2d 1052 (5th Cir. 1975) ....................... 40

*United States v. Brooks*,
697 F.2d 517 (3d Cir. 1982)........................... 27

*United States v. Buck*,
813 F.2d 588 (2d Cir. 1987)............... 43, 64, 73

*United States v. Burke*,
718 F. Supp. 1130
(S.D.N.Y. 1989) ............................ 45, 52, 61, 70

*United States v. Carpenter*,
190 F.3d 260 (D. Conn. 2016).......................... 4

*United States v. Chuang*,
897 F.2d 646 (2d Cir. 1990)............... 40, 48, 49

*United States v. Clark*,
638 F.3d 89 (2d Cir. 2011)........................ 71, 72

x

*United States v. Coffman,*
  859 F. Supp. 2d 871 (E.D. Ky. 2012) ........... 112

*United States v. Cohan,*
  628 F. Supp. 2d 355
  (E.D.N.Y. 2009) .................................. 46, 59, 60

*United States v. Confredo,*
  528 F.3d 143 (2d Cir. 2008) ..................... 84, 91

*United States v. Coppola,*
  85 F.3d 1015 (2d Cir. 1996) ................... 96, 105

*United States v. Davis,*
  226 F.3d 346 (5th Cir. 2000) ......................... 52

*United States v. DeFries,*
  129 F.3d 1293 (D.C. Cir. 1997) ................... 112

*United States v. Delano,*
  55 F.3d 720 (2d Cir. 1995) ........................... 105

*United States v. Dhinsa,*
  243 F.3d 635 (2d Cir. 2001) ........................... 48

*United States v. Doherty,*
  867 F.2d 47 (1st Cir. 1989) ........................... 102

*United States v. Dunn,*
  345 F.3d 1285 (11th Cir. 2003) ...................... 22

*United States v. D'Amico,*
  734 F. Supp. 2d 321 (S.D.N.Y. 2010) ....... 44, 62

xi

*United States v. Ebbers,*
  458 F.3d 110 (2d Cir. 2006) ...................... 90, 91

*United States v. Eisen,*
  974 F.2d 246 (2d Cir. 1992) ........................... 95

*United States v. Eng,*
  997 F.2d 987 (2d Cir. 1993) ..................... 48, 77

*United States v. Estacio,*
  64 F.3d 477 (9th Cir. 1995) ........................ 107

*United States v. Falso,*
  544 F.3d 110 (2d Cir. 2008) ..................... 47, 71

*United States v. Galpin,*
  720 F.3d 436
  (2d Cir. 2013) ......................... 43, 67, 68, 69, 73

*United States v. Gambino,*
  59 F.3d 353 (2d Cir. 1995) ............................ 21

*United States v. George,*
  975 F.2d 72 (2d Cir. 1992) ......................*passim*

*United States v. Grimm,*
  738 F.3d 498 (2d Cir. 2013) .......... 100, 101, 102

*United States v. Hamilton,*
  538 F.3d 162 (2d Cir. 2008) ........................... 39

*United States v. Hill,*
  55 F.3d 479 (9th Cir. 1995) ........................... 44

*United States v. Horn*,
   187 F.3d 781 (8th Cir. 1999) .......................... 44

*United States v. Ibrahim*,
   814 F.3d 30 (1st Cir. 2016)....................... 21, 22

*United States v. Jass*,
   569 F.3d 47 (2d Cir. 2009).............................. 94

*United States v. Jenkins*,
   578 F.3d 745 (8th Cir. 2009) ................. 84, 111

*United States v. Jones*,
   601 F.3d 1247 (11th Cir. 2010) ..................... 22

*United States v. Kail*,
   804 F.2d 441 (8th Cir. 1986) .......................... 45

*United States v. Kow*,
   58 F.3d 423 (9th Cir. 1995) ............................ 69

*United States v. LaChance*,
   788 F.2d 856 (2d Cir. 1986)..................... 60, 66

*United States v. Lagasse*,
   269 F. App'x 87 (2d Cir. 2008) ................ 16, 25

*United States v. Laureano-Perez*,
   797 F.3d 45 (1st Cir. 2015)............................ 17

*United States v. Leon*,
   468 U.S. 897 (1984) .................................. 46, 47

*United States v. Levis,*
    488 F. App'x 481 (2d Cir. 2012) ............... 17, 25

*United States v. Lutz,*
    154 F.3d 581 (6th Cir. 1998) ......................... 94

*United States v. Lynch,*
    726 F.3d 346 (2d Cir. 2013)............... 16, 18, 29

*United States v. Marcus,*
    560 U.S. 258 (2010) ..................... 105, 106, 113

*United States v. Markey,*
    131 F. Supp. 2d 316 (D. Conn. 2001)............. 74

*United States v. McNealy,*
    625 F.3d 858 (5th Cir. 2010) ......................... 17

*United States v. Miller,*
    962 F.2d 739 (7th Cir. 1992) ......................... 94

*United States v. Nagle,*
    803 F.3d 167 (3d Cir. 2015)........................... 40

*United States v. Nance,*
    666 F.2d 353 (9th Cir. 1982) ......................... 22

*United States v. Nicolo,*
    597 F. Supp. 2d 342 (W.D.N.Y. 2009).......... 113

*United States v. Oberoi,*
    547 F.3d 436 (2d Cir. 2008),
    *vacated on other grounds,*
    559 U.S. 999 (2010) ....................................... 18

xiv

*United States v. Oloyede*,
　982 F.2d 133 (4th Cir. 1992) .......................... 45

*United States v. Pakala*,
　568 F.3d 47 (1st Cir. 2009) ................ 17, 18, 28

*United States v. Paul*,
　634 F.3d 668 (2d Cir. 2011) ..................... 85, 91

*United States v. Perez*,
　528 F. App'x 319 (2d Cir. 2013) .................... 85

*United States v. Peters*,
　732 F.3d 93 (2d Cir. 2013) ............................. 18

*United States v. Porcelli*,
　865 F.2d 1352 (2d Cir. 1989) ....................... 113

*United States v. Regan*,
　706 F. Supp. 1102
　(S.D.N.Y. 1989) ............................ 46, 58, 60, 66

*United States v. Richmond*,
　735 F.2d 208 (6th Cir. 1984) .......................... 20

*United States v. Rigas*,
　583 F.3d 108 (2d Cir. 2009) ........................... 82

*United States v. Riley*,
　906 F.2d 841 (2d Cir. 1990) ........................... 42

*United States v. Romain*,
　678 F. App'x 23 (2d Cir. 2017) ........... 67, 68, 76

xv

*United States v. Rosa,*
  626 F.3d 56 (2d Cir. 2010)...... 43, 47, 73, 74, 75

*United States v. Rosa,*
  11 F.3d 315 (2d Cir. 1993)............................. 41

*United States v. Rossomando,*
  144 F.3d 197 (2d Cir. 1998)........................... 88

*United States v. Russian,*
  848 F.3d 1239 (10th Cir. 2017) ..................... 44

*United States v. Rutigliano,*
  790 F.3d 389 (2d Cir. 2015)................... 96, 102

*United States v. Rutkoske,*
  506 F.3d 170 (2d Cir. 2007)..................... 91, 97

*United States v. Simons,*
  206 F.3d 392 (4th Cir. 2000) ......................... 41

*United States v. Slevin,*
  106 F.3d 1086 (2d Cir. 1996)............ 96, 98, 100

*United States v. Smith,*
  569 F.3d 1209 (10th Cir. 2009) ..................... 22

*United States v. Tagliaferri,*
  648 F. App'x 99 (2d Cir. 2016) .................... 105

*United States v. Tropiano,*
  50 F.3d 157 (2d Cir. 1995)............................. 71

xvi

*United States v. Tunnessen*,
   763 F.2d 74 (2d Cir. 1985)........................ 26, 27

*United States v. Turk*,
   626 F.3d 743 (2d Cir. 2010)...................... 85, 91

*United States v. Ulbricht*,
   858 F.3d 71 (2d Cir. 2017), *cert. denied*,
   138 S. Ct. 2708 (2018) ............ 39, 41, 43, 69, 73

*United States v. Wasson*,
   679 F.3d 938 (7th Cir. 2012) ......................... 17

*United States v. Wilson*,
   11 F.3d 346 (2d Cir. 1993).............................. 31

*United States v. Young*,
   745 F.2d 733 (2d Cir. 1984)........................... 42

*United States v. Zanche*,
   541 F. Supp. 207 (W.D.N.Y. 1982)................ 43

*United States v Wey*,
   256 F. Supp. 3d 355 (S.D.N.Y. 2017)............. 70

*Williams v. Kunze*,
   806 F.2d 594 (5th Cir. 1986) .................... 40, 45

*Zedner v. United States*,
   547 U.S. 489 (2006) ................................*passim*

## Statutes

18 U.S.C. § 1956................................ 104, 105, 107

18 U.S.C. § 1957.............................. 105, 107, 108

18 U.S.C. § 3161........................................*passim*

18 U.S.C. § 3162......................................... 15, 16

18 U.S.C. § 3231................................................ xix

18 U.S.C. § 3282................................................ 95

18 U.S.C. § 3742................................................ xix

28 U.S.C. § 1291................................................ xix

U.S. Const. Amend. IV................................ 43, 71

## Rules

Fed. R. App. P. 4 ................................................ xix

D. Conn. Loc. R. Civ. P. 7 .................................. 20

D. Conn. Loc. R. Crim. P. 1 ............................... 20

## Guidelines

U.S.S.G. § 2B1.1................................................ 82

## Statement of Jurisdiction

The United States District Court for the District of Connecticut (Robert N. Chatigny, J.) had subject matter jurisdiction over this federal criminal prosecution under 18 U.S.C. § 3231. Judgment entered on December 21, 2018. Defendant's Appendix ("A") 35, A1046-A1050. On December 4, 2018, the defendant filed a timely notice of appeal pursuant to Fed. R. App. P. 4(b). A35, A1051-A1052. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## Statement of Issues
## Presented for Review

1. Whether the district court properly denied dismissal under the Speedy Trial Act based on a defense-requested continuance where the court weighed the statutory factors on the record when granting the defense request, but did not formally enter ends-of-justice findings until several months later, but still well before denying dismissal.

2. Whether the district court correctly denied suppression of evidence seized based on search warrants that were highly particularized and based on probable cause that the target entities and individuals were permeated by fraud, even if the warrant did not name the crime under investigation.

3. Whether the district court clearly erred in calculating loss according to a formula approved by this Court in a similar case.

4. Whether mailings and wires that were after the initial fraudulent policy applications but still necessary to execute several other aspects of the defendant's ongoing scheme, were "in furtherance" of the scheme and therefore properly a basis for calculating the statute of limitations.

5. Whether stolen death benefits resulting from fraudulently obtained insurance policies constitute "proceeds" of a specified unlawful activity and "criminally derived property."

xx

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket No. 19-70

_____

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

DANIEL E. CARPENTER,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

### BRIEF FOR THE UNITED STATES OF AMERICA

## Preliminary Statement

Beginning in 2006, Daniel Carpenter devised
and ran a Stranger Originated Life Insurance
("STOLI") scheme in which he fraudulently in-
duced insurance providers to issue and maintain
hundreds of millions of dollars in life insurance
policies on the lives of elderly strangers through
a corrupted welfare benefit plan, the Charter Oak
Trust ("COT"). While Carpenter knew that pro-

viders, for several reasons, would not issue policies to investors betting on the lives of strangers, he nonetheless submitted countless applications hiding just that, with the intent that he would strike it rich by selling those policies after a two-year contestability period. Although he promised the elderly insureds that their beneficiaries would reap the death benefit if they should die within the contestability period, he stole $30 million the first time such a death occurred, plowing much of the ill-gotten money back into COT policies (but using $1 million for a beach house).

After a several-week bench trial, Carpenter was convicted on multiple fraud counts and was ultimately sentenced to 30 months' imprisonment.

On appeal, Carpenter advances five arguments: that the Speedy Trial Act ("STA") was violated, the district court incorrectly denied his suppression motions, the district court used an improper loss formula, the statute of limitations expired as to many of the wire and mail fraud charges, and the stolen death benefits were not proceeds of specified unlawful activity or criminally derived property.

For the reasons set forth below, Carpenter's arguments are without merit and the district court's judgment should be affirmed.

2

## Statement of the Case

### A. Procedural history

On December 12, 2013, a grand jury in Hartford, Connecticut returned a 33-count indictment charging Carpenter and Wayne Bursey[1] with mail fraud, wire fraud, and conspiracy to commit mail and wire fraud. In short, Carpenter was charged with operating a scheme to defraud life insurance providers into issuing and maintaining STOLI policies through a purported employee welfare benefit plan called the Charter Oak Trust. A7, A43-A90. On May 14, 2014, a 57-count superseding indictment added charges of money laundering conspiracy, illegal monetary transactions, and money laundering, related to Carpenter spending over $30 million in scheme proceeds. A11, A223-A284.

On August 1, 2014, Carpenter moved to dismiss the indictment for—among other reasons—violation of the statute of limitations. A12. The district court denied the motion on December 21, 2015. A18, GA173-GA191.

On September 15, 2014, Carpenter moved to suppress evidence recovered as a result of search warrants executed at 100 Grist Mill Road ("100-GMR") in Simsbury, Connecticut, the main offices for the COT, in April 2010 and again in May 2011.

---

[1] Bursey died prior to trial. A16.

A13. On December 24, 2015, the district court denied the motions to suppress. A18, A535-A553.

On February 12, 2016, Carpenter moved to dismiss under the STA. A19. On February 16, 2016, before the commencement of trial, the district court denied the defendant's motion. GA359. The district court issued a written ruling on March 21, 2016. A22, A554-A564.

The district court (Chatigny, J.) conducted a bench trial, and on June 6, 2016, issued a 91-page Verdict and Special Findings (the "Verdict"), finding Carpenter guilty on all counts. A22, A564-A654 (reported at *United States v. Carpenter*, 190 F. Supp. 3d 260 (D. Conn. 2016)). On November 6, 2017, the district court denied Carpenter's motion for acquittal and motion for reconsideration of suppression of the 2010 warrant. GA499-GA527.

On December 3, 2018, the district court sentenced Carpenter principally to 30 months' imprisonment. A35, A1037, A1046. Carpenter appealed, and because this Court denied his motion for bail pending appeal, Doc. 39, Carpenter is currently serving his sentence.

## B. Summary of offense conduct

Beginning in 2006, Carpenter led a scheme and conspiracy to defraud life insurance providers into issuing and maintaining STOLI policies—insurance policies on the lives of strangers that Carpenter could resell after the two-year

4

contestability period. A566. Carpenter and his co-conspirators knew that providers would deny coverage if those providers were aware a policy was STOLI. *Id*. Providers did not want STOLI policies for many economic and non-economic reasons, and took many steps to detect stealth STOLI business. A574-A584.

Carpenter and his co-conspirators went to great lengths to hide their scheme from providers. First, they cloaked the scheme inside the COT, a corrupted welfare benefit plan. The COT "was structured to appear like an ordinary welfare benefit plan but ... its true purpose was to procure policies on elderly insureds for resale in the life settlement market." A591. Second, Carpenter and his co-conspirators repeatedly lied on every insurance application for COT policies. A605-A618. These lies concerned, among other things, the purpose for the policy, the source of funding, the intent to resell the policy, the financial inducements to the insured, and the use of life expectancy valuations. *Id*. Similarly, Carpenter and his co-conspirators lied to the providers whenever confronted with STOLI-related concerns. A622-A624. Third, Carpenter and his co-conspirators withheld critical documents from providers that would have revealed the true nature of the COT. A620.

Between 2006 and 2009, 84 COT-owned policies, having an aggregate face value of over $450

5

million, were issued on the lives of 76 elderly insureds based upon Carpenter's lies. A624, GA252-GA253. These insureds were recruited by agents affiliated with Carpenter and his companies, with the promise of free insurance for two years (the so-called "contestability period"); a large death benefit for the beneficiary less repayment of premiums and fees if the insured died within those two years; and otherwise a potential windfall from a sale of the policy. A591, A603-A605. Carpenter financed more than half of the policies through a $35 million line of credit with Ridgewood Finance, and the remainder though his own companies. A600-A603. Carpenter and his entities received millions of dollars in commissions as a result of these fraudulently induced policies. A618, GA254-GA255.

However, Carpenter faced difficulty in selling policies because of the 2008 financial crisis and changes in life expectancy valuation practices. A624. Nonetheless, Carpenter undertook extensive efforts to sell COT policies, and directed his employees to do the same. A625-A632. Carpenter was able to sell one policy, and nearly sold several others—until Ridgewood learned that Carpenter was trying to execute the sale without Ridgewood's knowledge. A629-A632. Ultimately most of the Ridgewood-financed policies were taken over by Ridgewood in satisfaction of the outstanding debt. A631.

6

One of the COT insureds, Sash Spencer, died within the two-year contestability period. A633. Instead of paying the death benefit to Spencer's beneficiary, Carpenter concocted specious reasons to deny the claim, and kept the entire amount after Ridgewood's funding was repaid. A637. Carpenter then invested some of the proceeds back into the COT, and used over a million dollars to buy a Rhode Island beach house. A638-A642.

## Summary of Argument

I. The district court correctly denied Carpenter's motion to dismiss under the STA. The substantial portion of time Carpenter claims is countable delay came from a defense-requested continuance that was granted following a hearing in which the district court wrestled with factors central to the STA. At the government's request, the district court entered formal ends-of-justice findings several months later, but well before ruling on Carpenter's motion.

II. The district court correctly denied Carpenter's motions to suppress evidence seized during two searches at 100-GMR. The warrants for both searches were highly detailed and based on probable cause that the relevant entities were permeated by fraud. The Constitution includes no requirement that the crime under investigation be named in the warrant, and the warrants were otherwise sufficiently particular. At a minimum, the warrants were not so obviously invalid that an executing agent could not rely on them in good faith, and the agents here conducted appropriately limited searches. Finally, Carpenter did not have standing to contest almost all of the seized material, and any error was harmless.

III. The district court did not clearly err in calculating loss based on a formula approved by this Court in a highly similar case. At any rate, the district court ignored the guidelines in sentencing

8

the defendant far below the range, and so any error was harmless.

IV. The district court correctly concluded that the mail and wire fraud counts were within the statute of limitations. The challenged wires and mailings all took place within the statute period, and were in furtherance of necessary parts of Carpenter's ongoing scheme.

V. The district court correctly found that the Sash Spencer death benefits—which were paid on fraudulently induced insurance policies—were proceeds of the criminal scheme. The arguments Carpenter advances on appeal were not raised to the district court, and the court did not plainly err in failing to address them.

9

## Argument

### I. The district court properly denied Carpenter's motion to dismiss the indictment under the STA.

#### A. Relevant facts

Carpenter and Bursey had their initial appearances on January 17, 2014, and the district court scheduled jury selection for March 11, 2014. A9. On January 30, 2014, the government began its rolling production of discovery, disclosing approximately 300,000 documents spanning over 1.2 million pages. A179, A191-A200, A214, A492, GA14-GA17.

The same day, based on Carpenter's anticipated receipt of these materials and his need to review them in order to prepare for trial, Carpenter filed a motion to continue trial to an unspecified date. A175-A176. Bursey filed a nearly identical motion five days later. A179-A180. The district court scheduled a conference for March 3, 2014, to discuss, among other things, a new trial date. A10, A185. Between January 31 and March 3, the defense began to review the government's discovery and evaluate potential pre-trial motions. A200, A214-A215.

At the March 3 conference, the government suggested a trial date in February or March of 2015, while defense counsel requested a "12 to 18 month[]" continuance in order to adequately prepare for trial. A198-A200. The judge expressed

10

concern about the STA and directed the parties to confer and submit a proposal. A213, A218. Two days later, after conferring, the government submitted a proposed scheduling order explaining the parties' need for time to effectively prepare for trial and requesting a trial in March 2015. A10, GA1-GA11.

On March 6, 2014, the district court issued an order ("Continuance-Order-1") that granted the motions to continue, rescheduled trial to March 10, 2015, and made ends-of-justice findings (reflecting counsel's need for time to effectively prepare for trial) to exclude the time from March 11, 2014 to March 10, 2015 from the STA calculations. A10-A11, A221-A222. Carpenter also signed a waiver acknowledging his STA rights and consenting to a continuance to March 10, 2015. GA12-GA13.

The superseding indictment was returned on May 15, 2014. A11, A223. Over the next several months, the defendants filed a number of substantive motions, including multiple motions to dismiss and suppress evidence. *See* A11-A13. These motions were fully briefed as of December 1, 2014. A13-A15.

On December 3, 2014, Carpenter moved to postpone trial to "sometime after September 7, 2015." A404-A408. He cited counsel's need for additional time to review discovery and effectively prepare for trial. *Id.*; *see also* GA18-GA22. Carpenter's counsel reiterated these reasons at a

11

hearing the next day. A499-A500. The govern-
ment stated it had no objection but would seek to
take depositions of some witnesses pursuant to
Fed. R. Crim. P. 15 to protect against the risk of
their health deteriorating before trial. *See* A507-
A508.

After hearing from the parties, the judge found
that "the arguments that are advanced in support
of the motion [to continue]… are more than suffi-
cient to support the motion[,]" but expressed con-
cern for the need for "finality" and that continuing
to postpone the trial was not in "anybody's inter-
est." A510. After balancing these interests, the
judge orally granted a continuance to October
2015 ("Continuance-Order-2"). A16, A510. Again,
Carpenter signed a waiver acknowledging his
STA rights and consenting to a continuance
"through October 31, 2015." A513.

From May 7, 2015, through the summer of
2015, Carpenter filed several more pre-trial mo-
tions. A16-A17. Additionally, the government
sought to conduct Rule 15 depositions. A17,
GA126-GA138. Although Carpenter's counsel had
indicated he would not object to such depositions,
he later indicated he may object. GA126. Unable
to reach an agreement, the government moved to
conduct the depositions, and Carpenter opposed.
GA126, A17. During a conference on September
22, 2015, the district court heard from both par-
ties and then granted the motion. A17, GA141-
GA144.

12

The district court also queried whether an October trial was feasible. GA145-GA153. The government cited several reasons why further delay was warranted, including trial preparation; discovery involving hundreds of thousands of documents that had continued into 2015; availability of mutually convenient dates for Rule 15 depositions; difficulty in arranging travel of witnesses; and pending Carpenter-filed motions. GA145-GA147 The government proposed a February 2016 trial. GA146.

Although stating that Carpenter did not want any further continuances, his counsel indicated he was continuing to review discovery, that the number of pending motions made it difficult to prepare for trial, and that the district court's rulings on the pending motions would affect the amount of time necessary to prepare for trial. GA147-GA149. He did not object to a February 2016 trial, he acknowledged that he was continuing to file motions that tolled the STA clock, and he indicated that a February trial would fall within the time permitted under the STA. GA149.

At the district court's request, the government formally moved for a February 2016 trial. GA152, A515-525. In a written order entered on October 13, 2015 ("Continuance-Order-3"), the court granted the motion and scheduled trial for February 9, 2016. A17-A18, A526-A527. Based on its oral findings granting the prior motion to continue, A510, and the reasons proffered for the new

13

continuance, the court entered ends-of-justice findings to exclude the time between March 10, 2015 and February 9, 2016 from the STA calculations. A526-A527.

On October 14, 2015, Carpenter moved to reconsider that continuance. *See* A528-A534. During a conference on October 28, 2015, the judge reiterated that a February trial was "reasonable" to allow the parties time to be "adequately prepared" for trial. GA167. Nonetheless, at the judge's direction, the government submitted a memorandum opposing the reconsideration motion, which the district court formally denied as moot after the trial. GA167, A18.

In December 2015, the district court denied several of Carpenter's pending motions, including motions to dismiss and suppress evidence. A18. Then, on January 8, 2016, the court held another conference to discuss jury selection and Carpenter's motion for a bench trial. A18-A19, GA192-GA207. Carpenter made no mention of his motion to reconsider or his STA rights. *See id.* Indeed, counsel indicated he still needed time to discuss a bench trial with Carpenter. GA194-GA196. Ultimately, Carpenter opted for a bench trial, and the court granted that request with the government's consent. A19.

The parties continued to file motions until the eve of trial, which had been rescheduled to February 16, 2016. A19. On February 12, 2016—just four days before trial—Carpenter filed a motion

14

to dismiss (the "STA Motion"), claiming violations of his STA and constitutional speedy trial rights. A19, GA209. The government responded on February 15, and the district court orally denied the motion on February 16. A19, A554, GA359. The court later issued a written ruling denying the STA Motion. A554-A563. It determined that only twelve countable days had elapsed. A557.

## B. Governing law and standard of review

The STA requires a trial to begin within 70 days of indictment or initial appearance, whichever occurs later, 18 U.S.C. § 3161(c)(1), and entitles the defendant to dismissal of the charges (with or without prejudice) if that deadline is not met, § 3162(a)(2). Certain periods of time, however, are excluded from this 70-day "clock." § 3161(h). Some periods of time are automatically excluded, including periods of delay resulting from the filing of pretrial motions, § 3161(h)(1)(D), and periods of time (up to 30 days) during which a "proceeding concerning the defendant is actually under advisement by the court," § 3161(h)(1)(H).

In addition, the district court may exclude time "resulting from a continuance … if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." § 3161(h)(7)(A). To exclude time under this provision, the judge must set forth, orally or in writing, his reasons for

15

finding that the ends of justice are served by granting the continuance. *Id.* A judge should consider several factors, including whether the case is so complex that it would be unreasonable to expect adequate preparation within the 70-day period, and whether counsel for either party needs additional time to effectively prepare for the case. § 3161(h)(7)(B)(ii) and (iv).

The required ends-of-justice findings "must be made, if only in the judge's mind, before granting the continuance[.]" *Zedner v. United States*, 547 U.S. 489, 506-507 (2006). However, they need only "be put on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2)." *Id.* at 507; *United States v. Lynch*, 726 F.3d 346, 354 (2d Cir. 2013) (same); *see, e.g., United States v. Breen*, 243 F.3d 591, 596-97 (2d Cir. 2001) ("the purposes of the statute are satisfied by a subsequent articulation"); *United States v. Lagasse*, 269 F. App'x 87, 89 (2d Cir. 2008).

This Court has held that time may be properly excluded, even where a judge does not recite the statutory factors, explicitly perform the required balancing of interests, or "utter the magic words 'ends-of-justice' at the time of ordering the continuance[,]" if the record demonstrates that a district court considered the factors and performed the balancing of interests before granting the continuance. *Breen*, 243 F.3d at 597; *see also United States v. Adams*, 625 F.3d 371, 380 (7th Cir. 2010)

16

("[The STA] does not require that the court recite the statutory factors[.]").

Moreover, "a district court need not explicitly state its reasons for granting a continuance nor make a 'best interest' finding if it is "obvious and set forth in [the] motion for a continuance." *United States v. Laureano-Perez*, 797 F.3d 45, 58 n.8 (1st Cir. 2015) (internal quotation and citations omitted); *see also United States v. Pakala*, 568 F.3d 47, 59-60 (1st Cir. 2009) (same). Indeed, relying on *Zedner*, courts of appeal have held that time may be properly excluded so long as a party's motion for continuance sets forth appropriate reasons for an ends-of-justice continuance, the court grants the motion based on those reasons without contemporaneously explaining its rationale or explicitly excluding time, and the court later confirms its rationale in ruling on a motion to dismiss. *See, e.g., United States v. Levis*, 488 F. App'x 481, 484–85 (2d Cir. 2012); *Adams*, 625 F.3d at 380; *United States v. McNealy*, 625 F.3d 858, 862 (5th Cir. 2010); *see also United States v. Adejumo*, 772 F.3d 513, 522 (8th Cir. 2014).

Finally, a defendant may be judicially estopped from claiming an STA violation. *See Zedner*, 547 U.S. at 504-506 (declining to apply judicial estoppel to facts of the case but noting it could apply in other circumstances); *Pakala,* 568 F.3d at 60; *United States v. Wasson*, 679 F.3d 938, 948 (7th Cir. 2012). Under the principle of judicial

17

estoppel, "[w]here a party assumes a certain posi-
tion in a legal proceeding, and succeeds in main-
taining that position, he may not thereafter,
simply because his interests have changed, as-
sume a contrary position, especially if it be to the
prejudice of the party who has acquiesced in the
position formerly taken by him." *Zedner*, 547 U.S.
at 504 (internal quotations omitted).

Thus, a defendant who takes notice of the
STA's requirements, requests a continuance
based on reasons authorized by the STA, and suc-
ceeds in obtaining such a continuance, is barred
from later arguing that the continuance violated
the STA. *See id.* at 504-506; *Pakala,* 568 F.3d at
60; *United States v. Oberoi*, 547 F.3d 436, 445 (2d
Cir. 2008) (declining to apply judicial estoppel but
observing that under *Zedner*, a defendant could
be estopped from claiming a STA violation "by vir-
tue of obtaining a continuance only if notice is
taken of the [STA]"), *vacated on other grounds*,
559 U.S. 999 (2010).

On appeal, this Court "review[s] the district
court's findings of fact as they pertain to a speedy
trial challenge for clear error and its legal conclu-
sions *de novo*." *Lynch*, 726 F.3d at 351 (quotations
and citations omitted)). This Court may affirm on
any ground supported by the record. *See United
States v. Peters*, 732 F.3d 93, 103 n.3 (2d Cir.
2013).

18

## C. Discussion

Only 16 countable days elapsed between Carpenter's first appearance in court and the start of trial.

### 1. Only 16 countable days elapsed from January 18, 2014 through March 10, 2014.

The district court correctly found—and there is no dispute—that the 70-day clock began to run on January 18, 2014, the day after Carpenter had his initial appearance, and only twelve countable days elapsed through January 30, 2014, when Carpenter filed his first motion to continue. A10, A175-A176, A557; Br. 21.

Once Carpenter's motion was filed, the STA automatically excluded all time "through the conclusion of the hearing on, or other prompt disposition, of the motion" and up to 30 days during which the motion was "actually under advisement by the court." §§ 3161(h)(1)(D), (H). Here, the district court held a conference to discuss Carpenter's motion on March 3, 2014, and then promptly issued Continuance-Order-1 on March 6, 2014. *See* A221-A222. Accordingly, no additional time elapsed from January 30 through March 6, 2014.

Finally, four days elapsed from March 7 through March 10, 2014. In denying Carpenter's STA Motion, the district court incorrectly excluded those four days, *see* A555-A557, which was understandable because Continuance-Order-1

19

was not entered on the docket until March 10, even though it was signed on March 6. *See* A10, A221-A222. However, the date of the order is the operative date. *See United States v. Richmond*, 735 F.2d 208, 213 (6th Cir. 1984). Thus, 16 countable days elapsed from January 18 through March 10, 2014.

Carpenter's arguments that as many as 31 days elapsed during this period fail.

*First*, Carpenter argues—without authority— that notwithstanding the order, the STA clock resumed on February 8 because his motion was "implicitly granted" on February 7 when the district court scheduled a conference and the deadline for pre-trial motions passed. Br. 22-24. The plain language of the order, however, makes clear that his motion was not granted until March 6. Just because the parties presumed the scheduling order would be revised does not mean it would have been revised, and nothing in the record suggests the court had deemed the motion granted any earlier. The court had not cancelled jury selection, and although unlikely, it could have denied the motions. *See* D. Conn. Loc. R. Civ. P. 7(b) (parties' agreement does not automatically extend time); D. Conn. Loc. R. Crim. P. 1(c) (incorporating civil rule).

*Second*, Carpenter argues that nothing justifies the exclusion of time for the five "unproductive" weeks between the filing of his motion to continue and the March 3 conference. Br. 22-23.

20

But the plain language of the STA *automatically* excludes the time from "the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." § 3161(h)(1)(D).

In any event, Carpenter's claim that the time was "unproductive" is baseless—the government produced over 1.2 million pages of discovery on January 30, 2014, and the defense promptly began to review the materials and evaluate potential substantive motions prior to the March 3 conference. A179, A191-A200, A214-A215, A492, GA14-GA16.

*Third*, Carpenter argues that even if his motion to continue was not "implicitly granted" on February 7, it was a routine motion that did not require a hearing and could not justify an automatic exclusion beyond 30 days from filing, which would have been March 1, 2014. Br. 23. Carpenter's motion, however, was not routine. Carpenter suggested neither a proposed trial date nor an approximation of how much time counsel needed. A175-A176. Given the district court's STA concerns, *see* A213, its decision to hold a conference[2] before deciding the motion was justified. *See United States v. Gambino*, 59 F.3d 353, 358 (2d

---

[2] The March 3 conference was a hearing for purposes of the STA. *United States v. Ibrahim*, 814 F.3d 30, 34 (1st Cir. 2016).

21

Cir. 1995) ("The length of an exclusion for complexity must be not only limited in time, but also reasonably related to the actual needs of the case."); *United States v. Nance*, 666 F.2d 353, 356 (9th Cir. 1982) (ends-of-justice "[c]ontinuances should not be granted lightly or as a matter of course"). Its decision to hold a hearing also deserves "substantial deference." *Ibrahim*, 814 F.3d at 33; *see also United States v. Smith*, 569 F.3d 1209, 1213 (10th Cir. 2009); *United States v. Dunn*, 345 F.3d 1285, 1294 (11th Cir. 2003).

Carpenter's reliance on *United States v. Barnes*, 159 F.3d 4 (1st Cir. 1998) and *United States v. Jones*, 601 F.3d 1247 (11th Cir. 2010) is misplaced. In *Barnes*, the motion was to schedule a status conference, which was resolved when the conference was scheduled, not when the conference took place. 159 F.3d at 12. In *Jones*, the motion was for an *in camera* hearing, and the Eleventh Circuit concluded that a hearing was not required only because the district court did not hold one. 601 F.3d at 1256. Here, by contrast, the motion was to continue the trial, which required the district court to balance the STA factors in order to make appropriate ends-of-justice findings, and its determination that a hearing was necessary was not an abuse of discretion. *See, e.g., Smith*, 569 F.3d 1209.

Lastly, even if this Court determines that Carpenter's motion did not require a hearing, it does not result in any additional time running off the

22

STA clock. Bursey filed a motion to continue on February 4, A179-A182, which, even under Carpenter's view, tolled the STA clock for 30 days through March 6, 2014—the same day that the district court granted the motions to continue.

## 2. No time elapsed from March 11, 2014 through March 10, 2015.

There is no dispute that the district court correctly excluded the time from March 11, 2014 through March 10, 2015 based on the ends-of-justice findings in Continuance-Order-1. A221-A222, A555-A557; Br. 22, 24.

## 3. No time elapsed from March 11, 2015 through February 16, 2016.

The district court also properly excluded the time from March 11, 2015 through February 16, 2016. *See* A555-A557. When Carpenter's counsel moved for another continuance on December 3, 2014 and requested a trial after September 7, 2015, he explained that he needed the additional time to review the voluminous discovery and effectively prepare for trial—a factor recognized in § 3161(h)(7)(B)(iv). *See* A404-A408, A499-A500. After hearing from the parties the next day, the court granted the motion and continued trial to October 2015. Although the court did not expressly mention the STA or utter the words "ends of justice," its colloquy with the parties made clear that it properly considered the statutory fac-

23

tors, particularly § 3161(h)(7)(B)(iv), and balanced the required interests. *See* A510. The court expressed the need for "finality" and indicated that postponing trial was not in "anybody's interest." *Id.* In fact, the court had long been concerned about the STA and bringing the case to trial "as soon as reasonable." A213. But the court ultimately determined that the reasons stated in Carpenter's motion—needing time to review discovery and prepare for trial—were "more than sufficient to support the motion." A510. This record demonstrates that the judge made the required findings in support of an ends-of-justice continuance "if only in the judge's mind, before granting the continuance[.]" *Zedner*, 547 U.S. at 506-507; *see Breen*, 243 F.3d at 596-97; *Adams*, 625 F.3d at 380.

Then, on October 13, 2015, the district court again continued the trial, this time to February 9, 2016, because the parties represented that they were still reviewing discovery, taking Rule 15 depositions, and preparing for trial—which are appropriate ends-of-justice considerations under § 3161(h)(7)(B)(iv). *See* GA145-GA149, A515-A527. Based on its prior oral findings from the December 4, 2014 hearing, as well as the reasons proffered for the new continuance, the court entered Continuance-Order-3, which properly memorialized its ends-of-justice findings to exclude the entire time from March 10, 2015 through February 9, 2016 from the STA calculations. *See*

24

A526-A527; *Zedner*, 547 U.S. at 506-507 (ends-of-justice findings must enter on the record before ruling on motion to dismiss); *Levis*, 488 F. App'x at 484–85; *Lagasse*, 269 F. App'x at 89; *Breen*, 243 F.3d at 596-97.

Finally, the STA clock was tolled from February 9 to the start of trial on February 16, 2016, because the parties continued to file motions through the eve of trial, including the government's motions in *limine*, Carpenter's motion regarding his place of confinement,[3] and Carpenter's STA Motion. *See* A19. On the first day of trial, the judge denied the STA Motion and heard argument on Carpenter's motion regarding his place of confinement. *See* A19, A554, GA321-GA359. Consequently, no time elapsed from February 9 to February 16, § 3161(h)(1), and the district court properly excluded the entire time period from March 11, 2015 through the start of trial.

On appeal, Carpenter challenges the continuance to October 2015, even though he was the one who requested the continuance, with full awareness of his STA rights, in order to have adequate time to review the voluminous discovery and effectively prepare for trial. *See* A404-A408, A499-A500, A513. Carpenter complains that when the

---

[3] At the time of trial, Carpenter was serving a sentence from an unrelated fraud conviction from the District of Massachusetts. PSR ¶ 2.

25

district court granted the continuance, it made no contemporaneous ends-of-justice findings to exclude time, and therefore, no time should be excluded from March 11, 2015 through May 7, 2015, when he filed another pre-trial motion that stopped the clock. Br. 25-29. He argues that the ends-of-justice findings in Continuance-Order-3 were retroactive and "invalid." *Id.* at 28.

Carpenter's argument lacks merit. As discussed, the district court's long-standing STA concerns and its colloquy with the parties made clear it was balancing counsel's need for time to prepare against its concerns over delay. A213, A510. The court's ends-of-justice finding in Continuance-Order-3 was not a retroactive finding but an articulation of the balancing of interests it undertook when granting the continuance. In denying the STA Motion, the court explicitly confirmed that when it granted the continuance, it did so because it "found that the ends of justice outweighed the best interest of the public and the defendant in a speedy trial." A555-A556. Thus, the court's ends-of-justice finding was "put on the record by the time [the] district court rule[d] on [the] defendant's motion to dismiss[.]" *Zedner*, 547 U.S. at 506-507.

Carpenter's reliance on *United States v. Tunnessen*, 763 F.2d 74 (2d Cir. 1985) further undermines his argument. As this Court explained in *Breen*, "we were careful in *Tunnessen* to state that 'the precise reasons for the decision [to grant a

26

continuance] need not be entered on the record at the time the continuance is granted.' Instead, we adopted the rule established in other circuits that, '[a]lthough the district court must decide initially whether to grant [an ends-of-justice] continuance, ... the purposes of the statute are satisfied by a subsequent articulation.'" 243 F.3d at 596 (quoting *Tunnessen*, 763 F.2d at 78 and *United States v. Brooks*, 697 F.2d 517, 522 (3d Cir. 1982)). In *Tunnessen*, the district court continued the trial without consulting the parties, there was no indication the parties needed more time, and there was no indication that the district court balanced the ends-of-justice factors. 763 F.2d at 78. In *Breen*, the Court distinguished *Tunnessen* and found no STA violation where—like here—defense counsel indicated he needed more time to prepare, the colloquy made clear that the judge had conducted the STA balancing, although it had not done so explicitly, and the court later entered an ends-of-justice finding to exclude time. 243 F.3d at 594-596.

Even if the ends-of-justice findings below are invalid, Carpenter is judicially estopped from challenging this exclusion of time because (1) he requested the continuance, (2) he expressly took notice of the STA in both his motion to continue and his waiver,[4] (3) his request was premised on

---

[4] While the waiver cannot authorize a prospective tolling of the STA, it demonstrates Carpenter was on notice of the STA and consented to the continuance.

27

the need for time to review voluminous discovery and prepare for trial, (4) based on those reasons, the government did not object, and the court granted the continuance, and (6) Carpenter is now taking an inconsistent position to gain an unfair advantage. *See Zedner*, 547 U.S. at 504-506.

In *Zedner*, the Supreme Court declined to apply the principle of judicial estoppel because the continuance was premised solely on the defendant's prospective waiver of STA rights—which was held unenforceable—and was not based on proper STA considerations. *See id.* Therefore, the defendant's position "was not 'clearly inconsistent' with the position" seeking dismissal of the indictment." *Id. Zedner* noted, however, that estoppel could apply if the defendant "had succeeded in persuading the District Court ... that the factual predicate for a statutorily authorized exclusion of delay could be established." *Id.*

Following *Zedner,* the First Circuit in *Pakala,* 568 F.3d at 60, held that judicial estoppel barred a defendant's STA claims because his position that the district court failed to articulate its reasons for granting two ends-of-justice continuances was "clearly inconsistent" with his motions requesting the continuances, in which he asserted statutorily authorized exclusions for delay and it was "clearly obvious" the court, in granting the motions, necessarily adopted the defendant's reasons. Similarly here, the district court granted the continuance based on the reasons proffered in

28

Carpenter's motion and at the hearing, which centered on the time necessary to review voluminous discovery and prepare for trial. *See* A404-A409, A507-A510. Accordingly, Carpenter is estopped from arguing that the exclusion of time from March 11, 2015 to October 2015 violated his STA rights.

Carpenter's remaining argument—that the exclusion of time from October 2015 to February 9, 2016, over Carpenter's objection, was unjustified—also lacks merit. Br. 29-30. The parties represented that they were still reviewing discovery and preparing for trial—which are appropriate statutory considerations under § 3161(h)(7)(B)(iv). *See* GA145-GA149. Although Carpenter himself did not agree to any further continuances, his counsel did not object to a February trial, noted the difficulty in preparing for trial, and indicated he was still reviewing discovery and could be prepared for trial in "December, January, or February." GA148-GA149. In any event, Carpenter's consent was not required because the district court made appropriate ends-of-justice findings. *See* A526-A527; *Lynch*, 726 F.3d at 356 ("district court may grant a continuance … without the consent of the defendant[.]").

When Carpenter's counsel later objected in his motion for reconsideration, he did not indicate whether he had finished his review of discovery or no longer needed time to prepare; rather, he focused solely on attacking the government's

29

preparation efforts. *See* A528-A533. During a con-
ference a few days later, the government reiter-
ated that time for trial preparation necessitated
a continuance, and based on this information, the
judge concluded "a February trial is reasonable. I
think that to expect counsel for either side to be
adequately prepared prior to that is simply unre-
alistic." GA167. Given the judge's finding that the
parties still needed time to prepare, the ends-of-
justice continuance to February 9, 2016 was jus-
tified.

Finally, even if the Court determines that an
ends-of-justice continuance from October 2015 to
February 9, 2016 was unjustified, the time was
automatically excluded under §§ 3161(h)(1)(D)
and (H) because the parties continued to file mo-
tions until the eve of trial, including Carpenter's
motion for a bench trial, which he filed on Sep-
tember 22, 2015. A17. That motion was not de-
cided until February 4, 2016, both because the
government's consent was required and, as late
as January 18, 2016, Carpenter still needed time
to decide whether to proceed with a bench trial.
GA194-GA196.

In sum, only 16 countable days elapsed be-
tween Carpenter's initial court appearance and

the start of trial. Accordingly, the district court properly denied the STA Motion.[5]

## II. The district court correctly denied Carpenter's motions to suppress.

### A. Relevant facts

#### 1. The 2010 warrant

On April 16, 2010, Wisconsin-based agents of the Internal Revenue Service-Criminal Investigations obtained a warrant to search 100-GMR (the "2010 warrant"), based upon a 57-page affidavit of Special Agent Shaun Schrader. A292, A294-A347, A348-A350. The warrant authorized the search of the office of Nova Benefits Plans LLC ("Nova"), also known as Benistar, located at 100-GMR, for several categories of documents and records maintained by and/or on behalf of several designated entities and any other trusts, businesses or entities that promote, administer, or utilize welfare benefit plans under Internal revenue Code § 419 ("419 plans"), from 2004 to the present. A348-A350.

Schrader alleged that Nova and related entities conspired to impede the IRS and aided in the

---

[5] Even if the Court finds an STA violation, any dismissal should be without prejudice, given that Carpenter moved for all continuances until October 2015, and tolled the STA clock with several motions from then until trial. *See United States v. Wilson*, 11 F.3d 346, 353 (2d Cir. 1993).

preparation of false tax returns by promoting and administering abusive 419 plans. A295-A297, A301-A303. The affidavit was in part based on an undercover operation and information provided by a confidential witness ("CW"), an independent insurance broker. A300-A304. The CW assisted 14 employers in setting up abusive 419 plans through the target entities and with contributions of over $8 million. A303. The CW provided information that Nova and Benistar administered various 419 plans, including many enumerated in the warrant. A304.

Schrader explained the history of the enumerated 100-GMR entities and 419 plans, how they were closely interrelated, that they had done a few hundred million dollars of business, and how their employees were interchangeable. A337-A340.

The 2010 warrant was executed on April 20, 2010. Executing agents were provided with a copy of the warrant and a "search warrant plan" that included an extensive summary of the investigation. Government's Sealed Appendix ("GSA") 88-GSA96. That summary contained a statement of objectives, which included securing evidence of abusive 419 plans for violations of the tax laws. GSA89. The plan identified the "known businesses and trusts," but also directed agents to

32

"[b]e aware for other businesses and trusts promoting or administering 419 plans/welfare benefit plans." GSA92-GSA93.

Agents seized 322 boxes of documents along with 13 images of computers located at 100-GMR. GSA99. The material taken was a small fraction of the total on site. GSA104-GSA105.

Following the 2010 search, privilege and Rule 41(g) litigation ensued. GSA99-GSA102. By consent order, some boxes of seized material were returned to Halloran and Sage ("Halloran") as counsel for Benistar Admin Services Inc. ("BASI"), an umbrella company for operations at 100-GMR. GSA101. Other boxes remained at the IRS in Wisconsin. *Id.*

### 2. The 2011 warrant

On May 25, 2011, the Department of Labor ("DOL") obtained unrelated search warrants for 100-GMR—along with other locations—for a Connecticut-based investigation (the "2011 warrant"), based upon the 60-page affidavit of Special Agent Lynn Allen. A285-A291, Defendant's Confidential Appendix ("CA") 4-CA63. The DOL investigation focused on a STOLI scheme using the COT and certain other entities and individuals located at 100-GMR and 300 First Stamford Place in Stamford, Connecticut ("300-FSP"). *Id.* The warrants authorized the search of 300-FSP, 100-GMR and images of 13 computer drives that were

33

previously seized in the 2010 search. CA5-CA7. Attachment D to the warrants authorized a search for specific categories of documents, for the period 2006 to the present, related to a specified list of individuals and entities, including the COT. CA5, CA58-CA60.

The affidavit alleged that the targets operated a STOLI scheme beginning in 2006. CA15-CA16. Of the 80 COT policies that Allen reviewed, all had the hallmarks of hidden STOLI, including lies to insurers falsely denying third party funding. CA18-CA19. The affidavit did not seek to search all records of BASI, but rather a subset of entities involved in the COT. CA5, CA9. The affidavit described how an intricate web of companies and people were involved in the COT—for example, there were trust documents listing either Grist Mill Capital ("GMC") or Nova Group as plan sponsor or administrator, and GMC was owned by Grist Mill Holdings, Caroline Financial Group, and Jack Robinson. CA10. GMC provided some of the funding for COT policies. CA18. Avon was owned by GMC, CA10; but also joined GMC in procuring the loan for much of the COT premium financing, C17-CA18; and participated in selling the COT policies, CA36-CA37.

On May 26, 2011, the DOL executed the searches of 100-GMR and 300-FSP. At briefings for executing agents, agents who were directly familiar with the search warrant, affidavit, and investigation summarized the criminal conduct in

34

the affidavit. GSA25-GSA26. Executing agents were provided with copies of Attachment D, and copies of the affidavit were made available. *Id.* The agents received copies of an Operational Plan ("DOL Ops Plan"), GSA132-GSA136, which listed the statutes under investigation, a summary of the case, and directed that agents should "search and seize evidence in accordance with … the [search warrant] and its accompanying affidavit." *Id.* Allen was present at 300-FSP and two other DOL agents intimately familiar with the investigation were on site at 100-GMR to direct the execution. GSA26.

Agents identified insurance applications for policies not ultimately issued by insurers. Although believing that these applications were covered by the original warrants, Allen nonetheless sought additional warrants. GSA137-GSA155.

Agents also served on Halloran a subpoena for COT-related documents from the 2010 search, which had been returned pursuant to the consent order. GSA118. A warrant issued in the Eastern District of Wisconsin for the COT-related material that had not yet been returned to Halloran. GSA27.

In total, agents seized 41 boxes of documentary evidence from 100-GMR, 42 boxes from 300-FSP, and 3 boxes from the IRS in Wisconsin. CA64-CA98. The material taken was a miniscule fraction of the total number of documents pre-

35

sent. GSA156-GSA160. Agents found nothing responsive in many of the areas searched. CA64-CA98.

Twelve computers were imaged at 100-GMR, a fraction of the total number of computers. CA64, GSA27.

During Allen's review of the seized material, she encountered evidence that the scheme started prior to 2006. Therefore, Allen obtained additional warrants to expand the scope of the search. GSA164-GSA181.

### 3. Initial motion to suppress

On September 15, 2014, Carpenter moved to suppress evidence from both searches. A13. As relevant here, Carpenter argued that the warrants were overbroad and insufficiently particular. *See* Docs. 81, 83.

In response, the government argued that (1) Carpenter lacked a reasonable expectation of privacy to contest the searches of the 100-GMR office space; (2) the warrants were not overbroad and were sufficiently particularized (regardless of whether they named the crime under investigation); and (3) that the agents acted in good faith in relying on the warrants and did not treat them as general warrants. GSA29-GSA76.

On December 24, 2015, the district court denied the motions to suppress. A535-A553.

36

The court found that Carpenter had standing because his office was one of the places entered in the course of each search. A540-A542. However, the court also found that Carpenter "has not established that he has standing to demand return of the vast majority of documents, which are in the nature of corporate records." A552.

As to particularity in the 2010 warrant, the court found that "[i]n contrast to a general warrant, Attachment 6 limits the search to documents that were maintained by or on behalf of an entity or trust that 'promote[d], administer[ed], or utilize[d] 419 plans,' between 2004 and 2010; the documents are further subdivided into several enumerated categories." A544.[6] Similarly, the court found the 2011 warrant sufficiently particular because "Attachment D limits the search to certain documents related to certain individuals and entities between 2006 and 2011. The documents are subdivided into various categories, including copies of federal and state income tax returns related to certain individuals, and records of income and expenses relating to certain businesses." A544-A545. Carpenter had misleadingly

---

[6] "Attachment 6" was an attachment to the IRS search warrant execution plan that the government attached to its initial motion response, *see* GSA94-GSA96, and was identical to Attachment B to the search warrant. Carpenter had mistakenly excised Attachment B from the warrant in his motion to suppress, instead attaching the application to the warrant. A292-A293.

37

attached the 2010 application and warrant as one document, A292-A293, which seemingly caused the court to note that the crime was listed in the warrant (it was actually on the face of the application), A544. Nonetheless, the court relied principally on the particularity of the incorporated attachment. A544. In any event, the court found the 2011 warrant sufficiently particular even though it did not name the crime in the attachment.

The district court did not reach the issue of good faith, but noted that "the defendant's sweeping assertions of bad faith on the part of the agents are not well-supported." A548.

### 4. Motion for reconsideration

On May 23, 2017, Carpenter moved to reconsider the district court's ruling denying suppression of evidence from the 2010 warrant. A24 (Doc. 243). The arguments and the government's response were largely the same as in the initial motions. In addition, the government argued that of the 43 exhibits taken from the 2010 warrants, none came from documentary files in Carpenter's office, and only one came from Carpenter's computer; even then, Carpenter had not shown a reasonable expectation of privacy. GA493, GA497-GA498.

In denying Carpenter's motion, the district court found that "Mr. Carpenter does not have standing to seek a suppression order as to the

great bulk of the government trial exhibits which resulted from the search in 2010." GA512.

## B. Governing law and standard of review

"On appeal from a denial of a suppression motion, [this Court] review[s] a district court's findings of fact for clear error, and its resolution of questions of law and mixed questions of law and fact *de novo*." *United States v. Ulbricht*, 858 F.3d 71, 95 (2d Cir. 2017) (citation omitted), *cert. denied*, 138 S. Ct. 2708 (2018).

### 1. Reasonable expectation of privacy (standing)

"A defendant seeking to suppress the fruits of a search by reason of a violation of the Fourth Amendment must show that he had a 'legitimate expectation of privacy' in the place searched." *United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008) (citing *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). "This inquiry involves two distinct questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable." *Id.* (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas*, 439 U.S. at 130 n.1.

39

For a corporate officer to assert a reasonable expectation of privacy in his corporate office, he must make "a sufficient showing of a possessory or proprietary interest in the area searched," and "must demonstrate a sufficient 'nexus between the area searched and [his own] work space.'" *United States v. Chuang*, 897 F.2d 646, 650 (2d Cir. 1990) (quoting *United States v. Britt*, 508 F.2d 1052, 1056 (5th Cir. 1975)). "What a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment; documents which he could have protected from seizure, if they had been his own, may be used against him, no matter how they were obtained from the corporation." *Lagow v. United States*, 159 F.2d 245, 246 (2d Cir. 1946) (per curiam).

Other circuits have likewise limited the ability of owners to suppress the fruits of a corporate search. *See, e.g.*, *United States v. Nagle*, 803 F.3d 167, 178–79 (3d Cir. 2015) (company's owner had no expectation of privacy in the offices of others and no subjective expectation of privacy in emails on company servers); *Williams v. Kunze*, 806 F.2d 594, 599–604 (5th Cir. 1986) (sole shareholder of corporation "had no reasonable expectation of privacy in corporate records maintained in a common file room"); *Britt*, 508 F.2d at 1055–56.

40

An employee's expectation of privacy in files stored on a work-issued computer is not objectively reasonable where the employer notifies employees that their computer files are subject to monitoring and/or are otherwise without an expectation of privacy. *See United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000); *United States v. Angevine*, 281 F.3d 1130, 1134 (10th Cir. 2002); *Muick v. Glenayre Electronics*, 280 F.3d 741, 743 (7th Cir. 2002).

### 2. Particularity and overbreadth

Particularity and overbreadth are "related but distinct concepts." *Ulbricht*, 858 F.3d 71 at 102. Overbreadth refers to whether the items authorized to be seized were broader than what was supported by the articulated probable cause. *See National City Trading Corp. v. United States*, 635 F.2d 1020, 1024 (2d Cir. 1980) (rejecting "overbreadth" argument that probable cause related only to a portion of the records authorized to be seized). Probable cause, in turn, is a "practical, common-sense decision whether, given all of the circumstances set forth in the affidavit … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 239 (1983). Such determinations by an issuing magistrate are entitled to "great deference," *id.*, and "doubts should be resolved in favor of upholding the warrant," *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993).

41

Particularity, on the other hand, asks whether the list of items to be seized was sufficiently specific to "enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992). This "guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990); *see also Andresen v. Maryland*, 427 U.S. 463, 480 (1976).

While a warrant must reasonably channel the discretion of those charged with executing it, *see, e.g.*, *Riley*, 906 F.2d at 844; *United States v. Young*, 745 F.2d 733, 759-760 (2d Cir. 1984), courts have never required precise specification of every item to be seized. "Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." *Riley*, 906 F.2d at 844-45. "Courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to uncover, and have insured that all

42

those facts were included in the warrant." *United States v. Buck*, 813 F.2d 588, 590 (2d Cir. 1987). This is true especially in fraud cases, where "business records are often incapable of being itemized one by one." *United States v. Zanche*, 541 F. Supp. 207, 210 (W.D.N.Y. 1982).

While the Fourth Amendment only requires that a warrant "particularly describ[e] the place to be searched, and the persons or things to be seized," recently this Court has in some cases added a third requirement, to "identify the specific offense for which the police have established probable cause." *Ulbricht*, 858 F.3d at 99 (quoting *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013)). Those cases have invalidated warrants authorizing searches for "evidence" of any crime, with little other limitation or description. *See Galpin*, 720 F.3d at 447 (nonspecific search for evidence of violations of "NYS Penal Law and Federal Statutes"); *United States v. Rosa* 626 F.3d 56, 58 (2d Cir. 2010) (search for records "which would tend to identify criminal conduct"); *George*, 975 F.2d at 75 (search for "any other evidence relating to the commission of a crime"); *In Re 650 Fifth Avenue and Related Properties*, 830 F.3d 66, 100 (2d Cir. 2016) (warrant failed to "particularize categories of computerized information for which there was probable cause to seize, or the temporal scope of the materials that could be seized").

43

Yet the Fourth Amendment does not, on its own terms, require identification of "the particular criminal activities under investigation" so long as the "things to be seized" are described with sufficient particularity to "enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *22 Blackwatch Trail, Apt. 8, Fairport, N.Y. 14450 v. United States*, 271 F. App'x 52, 53 (2d Cir. 2008); *see also United States v. Horn*, 187 F.3d 781, 787 (8th Cir. 1999) ("[N]either the fourth amendment nor our holdings require particularity with respect to the criminal activity suspected."); *United States v. Hill*, 55 F.3d 479, 481 (9th Cir. 1995) ("[C]ourts have demanded specification of the particular offense only when required by statute or when necessary to identify the objects to be seized with sufficient particularity."); *United States v. Russian*, 848 F.3d 1239, 1245 (10th Cir. 2017) (explaining that "warrants may pass the particularity test if they limit their scope either to evidence of specific federal crimes or to specific types of material" (quotation marks and citations omitted)); *United States v. D'Amico*, 734 F. Supp. 2d 321, 364 (S.D.N.Y. 2010) ("there is no constitutional requirement that a warrant must specify the crime for which a search is being conducted").

This Court has approached particularity and overbreadth differently in complex fraud cases, holding that where "there was probable cause to

44

believe that [a] business was permeated with fraud ... the agents could properly seize all of the business records." *National City Trading Corp.* 635 F.2d at 1026; *accord United States Postal Service v. CEC Services*, 869 F.2d 184, 187 (2d Cir. 1989). The so-called "all records" doctrine has likewise been applied by other circuits. *See, e.g.*, *United States v. Brien*, 617 F.2d 299, 309 (1st Cir. 1980); *United States v. Oloyede*, 982 F.2d 133, 140 (4th Cir. 1992); *Williams*, 806 F.2d at 598; *United States v. Kail*, 804 F.2d 441, 445 (8th Cir. 1986); *United States v. Bradley*, 644 F.3d 1213, 1259 (11th Cir. 2011).

Under the "all records" doctrine, "'[i]t is not necessary that the affidavit supporting the search warrant set forth specific factual evidence demonstrating that every part of the enterprise in question is engaged in fraud. Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are just the tip of the iceberg.'" *Oloyede*, 982 F.2d at 140 (quoting *United States v. Burke*, 718 F. Supp. 1130, 1140 (S.D.N.Y. 1989)); *see also Bradley*, 644 F.3d at 1259.

As applied, the all records "exception" is less an exception than "a recognition that a warrant— no matter how broad—is, nonetheless, legitimate if its scope does not exceed the probable cause upon which it is based." *United States v. Bowen*,

45

689 F. Supp. 2d 675, 683 n.6 (S.D.N.Y. 2010) (citations omitted). Nowhere is this more evident than in fraud cases, where "[t]he degree to which a warrant must state its terms with particularity varies inversely with complexity of the criminal activity investigated." *United States v. Regan*, 706 F. Supp. 1102, 1113 (S.D.N.Y. 1989); *see also United States v. Cohan*, 628 F. Supp. 2d 355, 362 (E.D.N.Y. 2009); *United States v. Abboud*, 438 F.3d 554, 575 (6th Cir. 2006) ("In a business fraud case, the authorization to search for general business records is not overbroad.").

### 3. Good faith

Even where a search warrant is deemed overbroad or insufficiently particular, a court nonetheless must determine whether the "good faith" exception applies. *See United States v. Leon*, 468 U.S. 897 (1984); *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984) (applying exception to particularity requirement). "The exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systematic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). In certain circumstances, however, "the conduct at issue [is] not so objectively culpable as to require exclusion." *Id.* at 146. Where "[an] officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues [is] objectively reasonable," a reviewing

46

court's subsequent determination that the warrant was constitutionally infirm will not trigger the exclusionary rule. *Leon*, 468 U.S. at 922; *see also Sheppard*, 468 U.S. at 989-90 ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him ... that the warrant he possesses authorizes him to conduct the search he has requested.").

Accordingly, the exception protects from suppression a search and seizure made in good faith reliance by government agents on a search warrant in all but four situations: "(1) where the issuing [judge] has been knowingly misled; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient ... that reliance upon it is unreasonable." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (citations omitted).

In a good faith analysis regarding particularity and overbreadth, a court may look to factors outside the warrant, including any unincorporated supporting documents, to make an "assessment of the officers' conduct in a particular case." *Rosa*, 626 F.3d at 64. The executing agents' familiarity with the supporting documents, instructions regarding the scope of the search, and the scope of the actual search are all relevant. *Id.*

47

#### 4. Harmless error

Even where a search is found to be improper, this Court nonetheless considers whether admission of improperly seized evidence is "harmless in light of the other evidence properly admitted." *United States v. Eng*, 997 F.2d 987, 998 (2d Cir. 1993). This Court "'will not conclude that a substantial right was affected unless it is likely that in some material respect the factfinder's judgment was swayed by the error.'" *United States v. Aguiar*, 737 F.3d 251, 263 (2d Cir. 2013) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997)). This Court examines the challenged evidence considering the totality of the trial evidence, and not simply the record at the time the district court denied suppression. *United States v. Dhinsa*, 243 F.3d 635, 663 (2d Cir. 2001).

### C. Discussion

#### 1. Carpenter lacked a reasonable expectation of privacy.

With the benefit of the trial record, it is clear that Carpenter cannot show an expectation of privacy in nearly all—if not all—of the trial exhibits drawn from the challenged warrants. *See Chuang*, 897 F.2d at 650 (defendant's burden to show "a sufficient nexus between the area searched and his own work space" (citation omitted)).

48

### a. 2010 warrant

The district court properly concluded that, in light of the trial evidence, "Mr. Carpenter does not have standing to seek a suppression order as to the great bulk of the government trial exhibits which resulted from the search in 2010." GA512; *see also* GA558; *Chuang*, 897 F.2d at 649 (no reasonable expectation of privacy for bank officer in someone else's office).

In fact, all but one of the exhibits that were used at trial from the 2010 warrant were business records that came from a place *other* than Carpenter's office:

- All 37 government trial exhibits (including parts of composite exhibits) from the boxes maintained by Halloran came from file cabinets in a cubicle or a storage room and not from Carpenter's office. GA497.

- The sole exhibit taken from the boxes that were maintained by the IRS was from a storage room, not from Carpenter's office. GA497.

- Of the five exhibits taken from the 2010 computer images, only Government Exhibit 1922 was taken from a computer in Carpenter's office. GA498.

Carpenter has not asserted a basis for an expectation of privacy in these business documents held in company storage and not in his own office.

49

Indeed, he repeatedly disclaimed an interest in the relevant businesses. Doc. 83 at 4.

Even as to the sole exhibit from Carpenter's computer (a document concerning the operation of the businesses at 100-GMR), Carpenter made no showing that the computer was anything other than a business computer. In depositions, Carpenter and his wife both asserted that all of the records seized in the 2010 warrant were owned by BASI. *See* GA494. At trial, Carpenter made clear that BASI was not his company and that he "made sure that [he] had no connection to the various Benistar entities." GA420; *see also* GA421 ("BASI was not owned by me"). Finally, the 100-GMR entities maintained a computer policy stating that "While these tools are provided for the performance of job duties and limited personal use, there should be no expectation of privacy." GSA162. *See Muick*, 280 F.3d at 743.

### b. 2011 warrant

Regarding the 2011 warrant at 100-GMR, the vast majority of the resulting trial exhibits were emails from company servers and all concerned COT-related business matters. GA316-GA317, GA218-GA251. No exhibits were from Carpenter's own computer. *Id.* Regardless of company policy, Carpenter had no expectation of privacy in these business documents that did not come from a place in which he had a reasonable expectation of privacy.

50

The record is undeveloped as to the location of the 14 hard copy documents (and 4 parts of composite exhibits) introduced from 100-GMR from the 2011 warrant. *If* one or more of those documents came from Carpenter's office, their admission, even if incorrect, would have been harmless as explained *infra*.

### 2. Both warrants were not overbroad and were sufficiently particular.

The 2010 and 2011 searches were supported by probable cause to show that the relevant entities were "permeated by fraud." *National City Trading Corp.*, 635 F.2d at 1026. Even so, the applications did not seek permission to seize all records at 100-GMR or even all records for the relevant criminal entities. Indeed, while (according to Carpenter) there were several hundred businesses operating at 100-GMR, *see* GA595, the warrants authorized seizures cabined to only a handful of those entities and related individuals, over a limited period of time, and covering a specific list of material. Thus the warrants were carefully tailored to reflect the underlying probable cause, and were particularized to "enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *George*, 975 F.2d at 75.

51

### a. 2011 warrant

The 2011 affidavit showed that the COT was a pervasive STOLI scheme perpetrated by several enumerated targets, including Carpenter. CA15. The pervasiveness of the fraud was supported by more than conclusory assertions. *All 80* COT policies Allen reviewed were fraudulent. CA18-CA19. Moreover, Allen found that nearly half of the policies older than two years already had their ownership transferred. CA19. Far more than just the "tip of the iceberg," the evidence in the affidavit left little doubt of the extent of the alleged fraud. *See Burke*, 718 F. Supp. at 1140 (evidence of the extent of the fraud "could consist of a large number of fraudulent transactions or of documentation ... that the entire operation is a scam").

Given the pervasiveness of fraud, the categories of items to be seized were appropriately tailored to reflect the probable cause. *See United States v. Davis*, 226 F.3d 346, 352 (5th Cir. 2000) ("[T]he fifteen categories of evidence described in the warrant are delineated in as much detail as is practicable for investigating the kind of fraud indicated in this case."). This was not a warrant that permitted the seizure of all records at 100-GMR. Rather, the breadth of the warrant was limited in three ways—by specific entities and people, by time period, and by categories of documents. A289-A291. These limitations were collec-

52

tive, *i.e.*, a document must fall within the temporal restriction, must relate to the specified individuals and entities (in which the common thread was the COT), *and* must fall within one of the enumerated categories of documents.

*First*, the warrant limited the seizure of documents from 2006 to the present (*i.e.*, 2011), consistent with the affidavit's description of the crime.

*Second*, the affidavit detailed how each of the individuals and entities related to the COT and its fraud. Regarding the target individuals, the affidavit alleged that they operated the scheme and their business affairs were intertwined with each other. CA15. Specifically:

- Carpenter was authorized to request advances under the Ridgewood loan to GMC, CA10-CA11; signed commitment letters with Ridgewood on behalf of GMC to fund COT policies, CA18; and accepted agreements on behalf of GMC memorializing the loan between the COT and GMC to fund individual COT policies, CA21, CA23, CA31-CA32, CA34.

- Robinson signed a COT declaration as Manager of GMC, CA10; had a capital interest in GMC, CA10; signed the credit agreement with Ridgewood on behalf of GMC and Avon, and was authorized to request advances, CA10-CA11, CA17; signed promissory notes with Ridgewood as Manager of GMC and

53

Member/Manager of Avon, CA17, CA18; was listed as a principal of Avon in connection with policy sales, CA37; communicated with others regarding the fraud, CA42; and was a primary contact with Ridgewood in connection with policy funding, CA42.

- Don Trudeau was authorized to request advances under the Ridgewood loan, CA10-CA11; met with someone at 300-FSP regarding COT insurance policies, CA12; received commissions on COT policies under TPG Group, CA35-CA36; represented himself as a principal of Avon in order to negotiate the sale of COT policies, CA36-CA37; and was the contact on change of ownership forms for COT policies, CA37-CA38.

- J. Edward Waesche was listed as agent on COT-related premium notices, CA11; signed COT insurance forms bearing misrepresentations, CA19-CA22, CA26-CA27; sent misleading e-mails to insurance companies related to COT policies, CA20, CA28; wrote misleading memoranda to insurance companies concerning COT insureds, CA22, CA27; signed internal agreements acknowledging the COT-GMC funding arrangement, CA21, CA23; received millions of dollars in commissions from COT policies, some through TPG Group, CA35-CA36; and communicated with others regarding the fraud, CA42-CA44.

54

- Bursey signed COT trust documents as President of Nova Group, the plan sponsor, CA10; signed the Secretary's Certificate on the Ridgewood credit agreement as a manager of GMC and Avon, and could request credit advances, CA10-CA11; signed COT insurance forms bearing false information that were sent to insurance companies, CA19-CA20, CA22, CA25, CA27, CA31, CA33; signed change of ownership forms for COT policies, CA37-CA39; and communicated with others regarding the COT, CA42.

- Charles Westcott signed and/or was listed as insurance agent on COT insurance forms that included misrepresentations, CA25, CA31, CA34; and received millions in commissions in his own name or with Pacini and Brad Kellam, CA35-CA36.

- Pacini, Andrew Varner, and Paul Martin were associated with COT applications and insureds through Pacini & Company in Houston. Pacini signed and/or was listed as insurance agent on fraudulent COT insurance applications, CA24-CA25, CA29, CA31, CA33-CA34; signed agreements memorializing COT-GMC loans, CA31, CA34; and received $1.6 million in commissions on 16 COT policies, CA36. Varner sent applications and other communications on behalf of Pacini & Company. CA29, CA31, CA33. Martin, operating from Pacini's address, assisted in the registration of

55

businesses for COT insureds, CA26, CA30; and he signed a financial statement for a COT applicant, CA31.

Similarly, the affidavit detailed how the enumerated entities related to the COT and were intertwined with one another. Each of the entities was related to BASI. CA9. However, the warrant did not ask to search for records related to BASI. Rather, it specified the COT and other BASI-related entities that operated the COT, as follows:

- Nova Group was COT sponsor in versions of COT trust documents and a legal opinion, CA10, CA10, CA16-CA17, CA30; and was used to transmit a fraudulent COT application, CA34.

- GMC was COT sponsor on one version of the COT declaration, CA10, CA16; owned 100% of Avon Capital, CA10; with Avon, took a $35 million line of credit from Ridgewood in order to fund GMC's loans to COT for premiums, CA10-11, CA17-CA18; submitted numerous COT Adoption Agreements, CA17; agreed, through Carpenter, to Ridgewood commitment letters funding the GMC loans to COT for premiums, CA18, CA21, CA23-CA24; through Carpenter, executed agreements to fund payment of premiums by COT, CA18; sent money to COT to pay premiums, either with Ridgewood money, its own assets, or assets of another BASI-related entity, such as Avon, CA18, CA21, CA24, CA26, CA32, CA34-CA35;

56

and was represented in e-mails by other tar-
gets related to the funding of COT premiums,
CA42-CA43.

- Grist Mill Holdings LLC owned 98% of
  GMC, with the remainder owned by Robinson
  and Caroline Financial Group. CA10.

- Avon was owned 100% by GMC, CA10;
  with GMC, entered into the credit agreement
  with Ridgewood, CA10-CA11, CA17-CA18;
  provided money for GMC to fund certain COT
  premiums, CA26; and, through Trudeau, sold
  COT policies as its own, CA36-CA37;

- Benefit Plan Advisors was used to sub-
  mit COT cases from 100-GMR to insurance
  companies. CA24, CA30, CA33.

- TPG Group was used to receive commis-
  sions on COT policies. CA35-CA36.

Finally, when limited by the time period, in-
dividuals, and entities discussed above, the cate-
gories of documents to be seized were appropri-
ately tailored to the probable cause provided by
the affidavit. Specifically:

- Paragraphs (a) through (d) and (j)
  through (l) permitted seizure of financial re-
  lated documents for the period from 2006 to
  the present for the targets and the subject en-
  tities, specifically books and records (para-
  graph a), tax and other IRS or U.S. Treasury
  forms (b and c), financial statements (d), bank

57

records (j), loan records (k), and billing records
(l). Given the financial nature of the scheme, it
was reasonable to seize documents that would
evidence the movement of money through and
by the various entities and individuals. *See Re-
gan*, 706 F. Supp. at 1113. With regard to the
entities involved, the affidavit showed an in-
tricate web of ownership, *e.g.*, Grist Mill Hold-
ings and Caroline Financial owned GMC,
which in turn owned Avon. This was made
even more complex by an overlay of financial
dealings, *e.g.*, Avon, which was owned by
GMC, entered into the Ridgewood line of credit
with GMC, but then also independently pro-
vided money to GMC for payment of other pre-
miums. Notably, this set of financial categories
of documents did not request all records, but
only financial records for the years of the oper-
ation of the COT, related to the specified enti-
ties and individuals. Similarly, seizure of per-
sonal financial records was equally appropri-
ate. As Carpenter was the "managing mem-
ber" of GMC, Bursey was the President of
Nova Group and thus sponsor of the COT, and
various others received millions of dollars in
commissions from working with the COT, it
was highly relevant to understand the finan-
cial picture of each individual for the years in
question. To the extent that an individual's tax
return may also show income from non-COT
sources, it did not vitiate the relevancy of the

58

document itself. Indeed, just because supposedly "innocent" records may be called for by a warrant does not render that warrant invalid. *See Cohan*, 628 F. Supp. 2d at 364.

• Paragraphs (e)-(h), (m), and (n) were broader in the types of documents permitted to be seized, but much narrower in subject matter. These categories were limited to documents related to COT, including employer payments (e), insurance policy records (f), correspondence (h), and the relationship between the COT and the named individuals and entities (m and n). Given that the COT was pervaded by fraud, it was reasonable for the Magistrate to permit a broader seizure of COT documents. *See CEC Services*, 869 F.2d at 187. Similarly, the seizure of Ridgewood-related documents (g) was reasonable given that Ridgewood was an outside funder of the COT, and thus its dealings with the subject individuals and entities were highly relevant to the fraud scheme.

• Paragraph (i), which called for the seizure of documents related to the transfer of ownership of insurance policies, was also reasonable. Whereas other insurance-related categories narrowed their focus to the COT only, the evidence in the affidavit regarding policy sales showed that such a limitation would be inappropriate. The evidence of the sale of COT policies shows that they were intermingled

59

with other policies as they were being offered for sale by Trudeau. Even if some of the transferred policies were not fraudulent, those policies were necessary to understand transactions involving fraudulent policies. *See Cohan*, 628 F. Supp. 2d at 364.

• Paragraphs (o), (p) and (q), were procedural or related to ownership of the computer systems, but did not otherwise authorize substantive seizures.

In short, given the breath of the probable cause here, the warrant was sufficiently particularized on its face to "enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *George*, 975 F.2d at 75. When limited by date range and specific individuals and entities, these categories clearly met the "standard for constitutional particularity," *i.e.*, that the warrant was "sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." *Regan*, 706 F. Supp. at 1110 (quoting *United States v. LaChance*, 788 F.2d 856, 874 (2d Cir. 1986)).

### b. 2010 warrant

The 2010 warrant was also supported by probable cause to show that the 100-GMR 419 plans were permeated by fraud. The Schrader affidavit showed that Nova Benefit Plan Advisors,

60

Benistar, and Benefit Plan Advisors—among other entities—existed to promote and administer a series of abusive 419 plans. A296-A297. Those plans defrauded the IRS by permitting participants access to tax-free money through frivolous injury claims; allowing the beneficiary to cash-out of a plan without paying the appropriate taxes; and encouraging participants to backdate enrollment documents. A296. These were not ancillary benefits, but the essence of the sales pitch, *see*, *e.g.*, A303, A308. Even the 419 aspect of these plans might have been fraudulent. A304.

Nor was the probable cause limited to one specific plan. Rather, these plans were promoted generically and interchangeably. *See*, *e.g.*, A303-A305. The CW identified plans, but acknowledged that this was not necessarily the entire universe. A304.

The information in the affidavit was not based upon a single transaction or event, but upon numerous transactions and undercover communications. *See Burke*, 718 F. Supp. at 1140. The CW assisted 14 clients in joining the 100-GMR 419 plans, with $8 million in contributions. A303. Schrader found that in all but one of those 14 cases the beneficiaries evaded taxes. A303-A304. A 100-GMR insider said "we've done thousands of these," A329, and they had a "few million dollar run," A338.

Moreover, the fraud was propagated by a high-level salesman (Neumann) with the assistance of

61

Bursey—the trustee—and other employees. A304-A305, A307, A316. For example, in Bursey's presence, Neumann guaranteed that any claim submitted will be approved as a disability so that a client can get his money back tax-free. A316.

In sum, this was a complex tax avoidance scheme, run across multiple trusts and promoting entities. In such a case, it was appropriate to seize broad sets of records of the relevant enterprises. *See CEC Services*, 869 F.2d at 185 (approving warrant calling for seizure of, among other things, "business, personnel, and financial records of the entities named herein"); *D'Amico*, 734 F. Supp. 2d at 358.

Still, the warrant carefully limited its scope to "the probable cause upon which it is based." *Bowen*, 689 F. Supp. 2d at 683 n.6. As with the 2011 warrant, the 2010 warrant did *not* ask for all records at 100-GMR. Rather, the warrant was similarly limited—evidence must be maintained by or on behalf of an entity or trust that "promote[s], administer[s], or utilize[s] 419 plans," within the time period 2004 to 2010, and within one of several enumerated categories of documents. A348-A350.

First, the temporal restriction on the material—2004 and forward—was well founded given that several 419 entities began much earlier. A337-A338.

62

Second, there was probable cause to believe that the various entities in Attachment B were involved in the operation of 419 plans. Specifically:

- Nova, Benistar, Benefit Plan Advisors, and US Benefits Group were responsible for the operation of fraudulent 419 plans at 100-GMR. Benistar was the original 100-GMR 419-promoting company. A337-A338. Nova was created in its place, with the same employees. A338. Nova and Benefit Plan Advisors each had a selection of 419 plans. A337-A338. US Benefits Group was created to buy out Benefit Plan Advisors and "to be a sales and marketing arm for all the companies involved." A338. Employees worked interchangeably for the various 419 companies. A338. In sum, it was reasonable to find probable cause that these entities were primarily involved in the promotion of abusive 419 plans.

- Benistar 419 Advantage Plan, Benistar 419 Plan & Trust; NOVA Sickness, Accident, Disability, and Indemnity Trust, NOVA Long Term Care Trust, NOVA Life One Plan & Trust, and Grist Mill Trust were among the abusive 419 plans at 100-GMR. *See*, *e.g.*, A304.

- The warrant also authorized seizure related to "any other trusts, businesses or entities that promote, administer, or utilize 419 plans." Although the CW was able to articulate the names of some of the 419 plans, this list

63

was not exhaustive. A304, A337-A338. As described above, the scheme related to the operation of 419 plans in general. Thus there was probable cause to seek evidence of additional 419 plans, under the circumstances at the time. *See Buck*, 813 F.2d at 590.

Finally, when limited by the time period, individuals, and entities discussed above, the categories of documents to be seized were tailored to the probable cause. Specifically:

- Paragraphs (1) and (2) related to clients and participants of the 419 plans, including client files, enrollment documents, termination documents, claim documents, and correspondence (1), and the investment of funds from clients (2). These records were at the core of the scheme, and relevant to showing whether clients evaded taxes.

- Paragraphs (3), (4), (6), and (7) related to the operation of the trusts and promoting entities—trust documents and financial records, bookkeeping and financial records, income and expense records, and corporate records. These records would show how the trusts and promoting entities were set up, how they made money, and how money from clients was utilized.

- Paragraph (5) authorized the seizure of loan records. Neumann described how Nova

64

utilized policy loans so participants could access the value of policies without paying taxes. A323-A324.

- Paragraph (8) authorized the seizure of legal opinions regarding 419 plans, which "were routinely included in promotional literature." A300.

- Paragraph (9) and (10) authorized seizures related to promotion of 419 plans. Much of the affidavit discussed how 419 plans were promoted as abusive tax shelters.

- Paragraph (11) called for the seizure of communications between employees, clients, insurance companies, brokers, and related parties. E-mail and other forms of communication were commonly used in furtherance of the scheme. *See*, *e.g.*, A340.

- Paragraph (12) called for appointment records for the various 419 entities. Appointment records were probative of which employees met with which brokers or clients, when, and how often.

- Paragraph (13) called for seizure of IRS publications, which were relevant to showing the knowledge, and willful avoidance, of the IRS rules.

- Paragraphs (14), (15), and (16) related to electronic media, but did not otherwise provide a basis for substantive seizures.

65

In short, the 2010 warrant authorized the seizure of an extensive list of material that was limited according to the affidavit's probable cause related to the operation of 100-GMR 419 plans. The list of categories provided more than adequate guidance to agents executing the warrant. *George*, 975 F.2d at 75. These categories clearly met the "standard for constitutional particularity," *i.e.*, that the warrant was "sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." *Regan*, 706 F. Supp. at 1110 (quoting *LaChance*, 788 F.2d at 874). Because the affidavit contained probable cause that the Nova/Benistar 419 plans were permeated by fraud, and the breadth of the warrant tracked reasonably the information provided by the affidavit, the warrant was legitimate because "its scope [did] not exceed the probable cause upon which it is based." *Bowen*, 689 F. Supp. 2d at 683 n.6.

### c. Carpenter's arguments are unavailing.

Carpenter's conclusory claims of overbreadth and reliance on inapt cases to place rigid restrictions on sufficiently particularized warrants should be rejected.

*First*, Carpenter incorrectly reads this Court's cases to require a warrant to reference the crime under investigation even where that reference would provide no meaningful guidance to the ex-

66

ecuting agents and where the probable cause permits seizure of all records of particular entities or individuals. Carpenter relies principally on *Galpin*, *George*, and *650 Fifth Ave.*, each of which involved extremes that are not applicable here, in that they invalidated warrants that permitted general searches for evidence of any crime. In *Galpin*, 720 F.3d at 447, this Court invalidated a warrant that, in a case where the probable cause related to a sex offender registration offense, authorized a search for "evidence of violations of NYS Penal Law and or Federal Statutes." Likewise, in *George*, 975 F.2d at 75, the Court invalidated a search where the affidavit concerned a single armed robbery, while the warrant authorized a search for "other evidence relating to the commission of a crime." And in *650 Fifth Avenue*, 830 F.3d at 100, the warrant did not even reference crime generically, but simply authorized a general search of all computers.

Carpenter similarly relies on *United States v. Romain*, 678 F. App'x 23, 25 (2d Cir. 2017). Although this decision does not describe the warrant, the record reveals that the warrant, like in *650 Fifth Avenue*, authorized a search of a cellular phone with no subject matter restriction at all (whether crime, date, or description of items). Case No. 15-3404, Doc. 30 at 67.

A more apt comparison lies in *22 Blackwatch Trail*, 271 F. App'x at 53. There, the affidavit "established probable cause to believe that evidence

67

of criminal tax offenses and conspiracy to defraud the government" would be found at the defendant's residence, and so this Court held that the warrant appropriately "listed types of records relating to [the defendant's] finances, correspondence with the IRS, safe deposit box records, client lists, and financial records and correspondence relating to [the defendant's business]" within a specified time period. *Id.* In contrast to the warrants in *George*, *Galpin*, *650 Fifth Avenue*, and *Romain*, "the list of items was neither generic nor so wide-ranging as to authorize the seizure of any 'evidence,'" and so "there was no need to identify the particular criminal activities under investigation." *Id.* So too here, where the warrants did not invoke a generalized "evidence" clause, but called for a specific list of categories for relevant individuals and entities within a specified time frame.

*Second*, Carpenter's claims of overbreadth—in addition to rehashing his particularity claim—miss the significance of the subject matter limitations. Although Carpenter complains that "arguably all materials located in Nova Benefit Plans LLC's offices ... are maintained by or on behalf of Nova Benefit Plans LLC," Br. 50, Carpenter himself testified that there were several hundred businesses operating at 100-GMR, *see* GA595, and yet the lists in each warrant here were far narrower. Similarly, Carpenter disclaimed involvement with many of them. GA420.

68

*Third*, Carpenter undertakes no meaningful analysis of the affidavits' facts in support of the various categories to be seized, but instead simply labels categories like "bank records" and "records of income and expenses" as too broad. Br. 51. Breadth standing alone does not invalidate a warrant. *Ulbricht*, 858 F.3d at 102. Instead, as discussed in detail above, the scope of the warrants here did "not exceed the probable cause upon which [they are] based," *Bowen*, 689 F. Supp. 2d at 683 n.6. In particular, this is a complex business fraud case, and so "the authorization to search for general business records is not overbroad." *Abboud*, 438 F.3d at 575. The cases Carpenter cites regarding the breadth of certain terms are factually and legally distinct. *See, e.g.*, *United States v. Kow*, 58 F.3d 423, 427-28 (9th Cir. 1995) (declined to apply "permeated with fraud" doctrine where affidavit focused on violence against employee, not the business fraud).[7]

*Fourth*, Carpenter unreasonably attempts to narrow the application of the "all records" doctrine. Br. 54-55. While the affidavits here did not explicitly invoke this Court's decision in *National City Trading Corp.*, they certainly contained

---

[7] While the detail of the warrant was supported by probable cause and provided useful guidance to executing agents, to the extent the Court finds fault with the breadth of any individual category, individual, or entity, severability would apply. *See Galpin*, 720 F.3d at 448-450.

enough evidence to conclude, at a minimum, that the activities described were the "tip of the iceberg." *Burke*, 718 F. Supp. at 1140. Moreover, both affidavits explicitly averred that their respective lists of evidence would be located on the premises. A295, A346, CA39-CA41. This is not a "post hoc rationalization," as Carpenter claims—the breadth of the seizure was incorporated into the affidavit and the warrant. Br. 53; *see* GA557-GA558 (district court adopted government's arguments, which included invocation of all records doctrine).

Carpenter's reliance on *United States v Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017) is misplaced. In *Wey*, the affidavit was based on isolated transactions and did not support the conclusion that this information was just the "tip of the iceberg" or that the fraud scheme was a substantial portion of the company's business. *Id*. at 390. Here, conversely, both affidavits (1) were based on numerous related transactions and communications from 100-GMR insiders; and (2) showed that the target entities and individuals were permeated by fraud, and that they were inextricably tied together. *See*, *e.g.*, A305, CA18-CA19 (all 80 COT policies fraudulent). Moreover, the affidavits here, unlike in *Wey*, limited the searches to the fraudulent businesses and a defined date scope.

### 3. The agents acted in good faith.

Even if the warrants are defective, this Court should nonetheless affirm because the agents

70

acted in good faith. While the district court did not reach the issue, the record is more than sufficient for this Court to affirm on that basis. *See United States v. Tropiano*, 50 F.3d 157, 161 (2d Cir. 1995).

### a. The agents reasonably relied on the warrants.

Even if the warrants were flawed in some way, they were not "so facially deficient such as by failing to particularize the place to be searched or the things to be seized that reliance upon [them] is unreasonable." *Falso*, 544 F.3d at 125.[8]

*First*, the warrants neither "omit[ted] [n]or misstate[d] information specifically required to be contained therein, *i.e.*, 'the place to be searched, and the persons or things to be seized.'" *United States v. Clark*, 638 F.3d 89, 101 (2d Cir. 2011) (quoting U.S. Const. amend. IV). Both warrants contained extensive descriptions of the places to be searched and detailed three-page lists of items to be seized. A289-A291, A348-A350. Each warrant was limited by dates, entities, and individuals that were discussed in the applications, and so there was no obvious mistake in the warrant. *Cf. Clark*, 638 F.3d at 102 (collecting cases where descriptions in warrant diverged

---

[8] Regarding good faith, Carpenter argues only under this fourth *Falso* factor. Br. 57.

71

from those in application). Thus there was no obvious constitutional defect.

*Second*, there was nothing in either list of items that should have been a "red flag" to executing agents that the warrants were invalid. Rather, the complexity of each scheme would lead a reasonable officer to expect similarly broad categories of records to be included in a warrant, cabined by the date range and entities and individuals under investigation. *See Bowen*, 689 F. Supp. 2d at 684 ("an agent would reasonably expect to seize a broad swath of e-mails in a case involving a multi-year, complex fraud scheme in which e-mail communications allegedly played a key role"). Absent a glaring error in description—which does not exist here—an executing agent is not otherwise required to second guess a magistrate's probable cause finding. *Clark*, 638 F.3d at 102 (distinguishing "a facial defect in the warrant with a patent lack of probable cause to support the warrant"); *Sheppard*, 468 U.S. at 989-90 ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him ... that the warrant he possesses authorizes him to conduct the search he has requested.").

Carpenter's reliance on *George* is misplaced. There, the warrant contained a catch-all provision authorizing seizure of "any other evidence relating to the commission of a crime," 975 F.2d at 75, without any further specification of *what* crime or what evidence. In that context—where

72

particularity relied on reference to "evidence of a crime," with no further guidance—the Court found it was unreasonable for an agent to trust the validity of the warrant. *Id.* at 78. But here neither warrant purported to rely on a specific crime for its particularity, but instead on an extensive list of categories based on the affidavit. Even were this Court to find that some or all of those categories were impermissibly broad, each was detailed and limited in a way that no agent would "suspect it was invalid." *George*, 975 F.2d at 78 (citation omitted).

Nor was there then-extant precedent that would have told the agents in 2010 and 2011 that these warrants were obviously facially invalid. Like *George*, the other cases cited by Carpenter reflect extremes that do not apply here. *See United States v. Bianco*, 998 F.2d 1112, 1115-16 (2d Cir. 1993) (warrant authorized search of a residence for "[N]otes, Ledgers, Envelopes, Papers…" with no "more particular limiting language"); *Buck*, 813 F.2d at 591 ("warrant did not contain any "list of documents" or otherwise limiting language which tended to narrow its scope."); *Rosa*, 626 F.3d at 62 (warrant authorized general search of computer equipment). Carpenter notably does not rely here on this Court's decisions in *Galpin*, *650 Fifth Ave.*, and *Ulbricht*, which were decided in 2013, 2016, and 2018, respectively, well after the warrants here. *Galpin*

73

was the first decision to suggest a formal require-
ment to "identify the specific offense for which the
police have established probable cause." 720 F.3d
at 445. Regardless, the more apt precedent to an
agent involved in a complex fraud investigation
would be related to the "all records" doctrine, *see
National City Trading Corp.*, 635 F.2d at 1026,
which was established law in 2010 and 2011.

### b. The agents conducted appropri- ately limited searches.

Nor did the agents treat the warrants as gen-
eral warrants. *See Rosa*, 626 F.3d at 64 (applica-
tion of the exclusionary rule necessarily requires
an "assessment of the officers' conduct in a particu-
lar case"). Indeed, the record shows "that the of-
ficers proceeded as though the limitations con-
templated by the supporting documents were pre-
sent in the warrant itself, and, as a result, their
actions bear none of the hallmarks of a general
search." *Id.* at 66 (internal quotation omitted); *see
also United States v. Markey*, 131 F. Supp. 2d 316,
326 (D. Conn. 2001).

*First,* the executing agents were provided with
a summary of the investigation so as to undertake
a properly limited seizure of evidence. In the 2010
search, agents were provided with an operations
plan that included a 3-page investigative sum-
mary and a copy of Attachment B. GSA88-GSA96.
Those agents also met with Schrader and others
involved in the investigation prior to the search
to discuss the investigation, and there were

74

agents at the search site familiar with the facts in the affidavit—including Schrader—available to direct the seizures. GSA74.

In the 2011 search, the agents were well aware of the crimes under investigation in that they received an operational plan that listed the statutes under investigation (wire, mail, and insurance fraud), included a summary of the investigation into the COT, and directed the agents to "search and seize evidence in accordance with ... the [search warrant] and its accompanying affidavit." GSA132-GSA136. Moreover, the agents met prior to the searches with either Allen or Allen's supervisor (who was well-familiar with the affidavit). GSA74. At these briefings Allen and her supervisor explained the investigation and made available copies of the affidavit for agents to read. *Id*. They were also on site to guide the searches as they unfolded. *Id*.; *see Rosa*, 626 F.3d at 64.

*Second*, the extent of the seizures provides clear evidence that agents did not view themselves as engaging in a general search. Despite hallways and offices full of records at 100-GMR, the IRS seized a mere 322 boxes and the DOL seized only 41. CA64-CA98, A351-A403. In fact, the 2011 inventories indicate that nothing was taken from many areas. "Entry and exit" photos for both searches show that such a small portion of the records were taken that in most areas—including Carpenter's office—there appear to be no differences between when the agents entered and

75

when they exited. GSA103-GSA105, GSA156-GSA160. It is hard to imagine, given the information provided to the agents, that simply naming the statute in the warrant would have provided any additional meaningful guidance to the agents. *See Romain*, 678 F. App'x at 26 ("Paralleling *Rosa*, the district court credited the government's assertions that the agent who reviewed the contents of the device seized and prepared the warrant and supporting materials did not search items other than what [he] would have searched had the Warrant referenced the statute." (quotation marks omitted)).

*Third*, agents decided, after coming across numerous insurance applications for untaken COT policies, to seek an additional warrant to seize those applications—even though they may have been covered by the initial warrants. Such are not the actions of agents who believed they are entitled to a general rummaging through 100-GMR.

*Fourth*, the good faith of the agents executing the computer searches is equally apparent. The agents that executed the computer searches were Allen and others directly participating in this investigation, all of whom were intimately familiar with the investigation and the affidavit. GSA75. Thus they were able to cabin their searches to the investigation. Indeed, their good faith was evidenced when they came upon pre-2006 COT-related documents. Rather than seize those documents in plain view, Allen again sought a warrant

76

expanding the scope of the search. GSA164-GSA181.

Finally, the evidence used at trial from the seizures all related to the investigations described in the affidavits—the trial concerned the COT and the STOLI scheme, which was the subject of the 2011 affidavit, and the COT is a 419 plan, which was the subject of the 2010 warrant. This contrasts with *George*, for example, where the shotgun that became evidence at trial was seized under the general "evidence of any crime" provision, and was unrelated to the remainder of the warrant. 975 F.2d at 77-78. Put differently, there is no evidence that would be unavailable had the warrant been cabined to the crimes under investigation.

### 4. Any error was harmless.

Finally, given that Carpenter lacked an expectation of privacy sufficient to suppress most of the warrant-derived evidence at trial, any error related to the remaining suppressible evidence should be deemed "harmless in light of the other evidence properly admitted." *Eng*, 997 F.2d at 998. There were over 800 exhibits admitted at trial, which grows to well over 1000 exhibits considering the composite exhibits. The comparatively few documents over which Carpenter had an expectation of privacy would not have affected "in some material respect the factfinder's judgment." *Aguiar*, 737 F.3d at 263.

77

### a. 2010 warrant

Only 43 exhibits (or parts of composites) came from the 2010 warrant, and only one of those (Exhibit 1922) came from Carpenter's computer and thus could have been subject to suppression. Yet that document was clearly not critical to the court's analysis. In its verdict, the court cited Exhibit 1922 as support that Carpenter controlled the Benistar entities. A589. However, the court also employed many other non-suppressible pieces of evidence, as well as testimony of witnesses, in support of the same point, and thus the admission of Exhibit 1922 by itself could not have swayed its decision. *See* GA558.

### b. 2011 warrant

Most 2011 warrant-derived exhibits came from company servers, in which Carpenter had no reasonable expectation of privacy, and nothing was introduced from Carpenter's computer. Only 14 100-GMR-derived hard copy exhibits (and 4 sub-parts of composites) *could* have come from Carpenter's office (the record was undeveloped on this point), but there is no meaningful risk that their exclusion would have affected the Verdict. In fact, the court made reference to only two of the 14 exhibits. Exhibit 1331 was part of the court's factual recitation regarding Carpenter's dispute with Universitas over the disposition of the Spencer death benefits, A637, but was not relevant to the ultimate legal determination that the Spencer

78

death benefits were proceeds of unlawful activities, A648-A649. Exhibit 1856 showed that some Spencer death benefit money was used to repay a Ridgewood loan. A639. However, the same information was also in the bank statement in Exhibit 1857, GA305-GA308, which came from Bank of America, GA318. Thus exclusion of Exhibit 1856 would not have affected the court's conclusions.

III. **The district court arrived at a reasonable estimate of loss.**

   **A. Relevant facts**

   **1. Insurance company testimony**

The district court found that Carpenter conspired to defraud life insurance providers into issuing and maintaining policies that would be denied if the providers knew the policies were STOLI. A566. Providers did not want STOLI policies for many economic and non-economic reasons, and took many steps to detect—and deny—STOLI business. A574-A584.

Regardless of the reasons they chose to reject STOLI business, insurance providers testified that they would not knowingly issue STOLI policies. Thomas Buckingham, a Phoenix executive testified that "[Phoenix's] policy is that we do not accept or want STOLI." GA369. Michael Parker, a Lincoln executive, testified that "[Lincoln] didn't want [STOLI] and disallowed it." GA407. Franklin Best, general counsel for Penn Mutual's

79

insurance operations, explained that "Penn Mutual is opposed to STOLI, will not knowingly sell a policy when it's a STOLI policy." GA399. Normally, Buckingham explained, pricing an insurance policy is "a fairly complicated process" that includes "what has happened over long periods of time in the industry." GA365-GA366. However, Parker testified, insurance companies do not have that kind of history with STOLI policies, and so it "causes risks that we simply don't fully understand or are not familiar with." GA407-GA409. Accordingly, the district court found, if an insurance provider learned an application was STOLI, it would be declined. A583-A584.

In all, 84 COT-owned policies were issued on the lives of 76 insureds, based upon Carpenter's lies. A624, GA252-GA253.

### 2. Loss calculation

In advance of sentencing, the government presented intended and actual loss calculations based on the method approved by this Court in *Binday*, which were adopted in the PSR. GA562-GA588; PSR ¶¶ 167-173. Although the court found that the larger intended loss calculation was consistent with Carpenter's intentions, it adopted the actual loss calculation. A1024-A1026.

For policies that were issued but later terminated because of a death, lapse or otherwise, loss included commissions, any death benefit, and any

fees, including (for non-death terminations) rein-surance. PSR ¶ 172. All premiums that the insur-ance companies retained were then subtracted. *Id*. For active policies, only commissions were counted, *i.e.*, no attempt was made to predict the profit or loss upon future death or lapse. PSR ¶ 173. A resulting loss figure was derived from adding up losses for those providers that had them. *Id*.

The district court rejected Carpenter's attempt to compel the government to speculate on the loss based on how the policies would have been priced had the insurance providers known that they were STOLI. A1025-A1026. Carpenter had pro-posed that the loss be linked to two of the identi-fied disadvantages to STOLI, at the same time ac-knowledging that "calculation of the potential loss is beyond the capability of the defense." Doc. 347 at 31. Relying on *Binday*, the court explained that "it's a fraudulent inducement case, it's not a case about the spread between STOLI and non-STOLI from the insurance company's stand-point." A1026.

### 3. Sentencing

The court sentenced Carpenter to 30 months' imprisonment, well below the guidelines range of 292 to 395 months. A1031, A1037. In so doing, the district court explained: "[A]ll agree that this range is plainly excessive, and while it does have a framing effect or an anchoring effect, as a judge

81

I'm going to ignore it just like I ignore inadmissible evidence in making findings and conclusions. I mean no disrespect to the guideline, but I'm putting it aside and I am addressing the 3553 factors without regard to the guideline." A1031.

## B. Governing law and standard of review

"Loss for purposes of the fraud guideline of the United States Sentencing Guidelines is defined as the greater of actual loss or intended loss." *Binday*, 804 F.3d at 595 (internal quotation marks, brackets, and ellipsis omitted); *see also* U.S.S.G. § 2B1.1, Application Note 3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense," § 2B1.1 cmt. 3(A)(i). "A district court is not required to calculate loss with absolute precision, but need only by a preponderance of the evidence make a reasonable estimate of the loss given the available information." *Binday*, 804 F.3d at 595 (internal quotation marks omitted); *see also United States v. Rigas*, 583 F.3d 108, 120 (2d Cir. 2009).

This Court reviews a district court's factual findings as to loss for clear error and its legal conclusions *de novo*. *See Binday*, 804 F.3d at 595.

## C. Discussion

There was no error in the district court's loss calculation, much less clear error.[9]

---

[9] Although Carpenter claims that the loss methodology is reviewed *de novo*, this Court held in *Binday*

### 1. The district court's decision appropriately followed *Binday.*

The district court correctly calculated loss based on the methodology approved in *Binday*, a case involving a STOLI fraud scheme, very similar to the facts here. There, this Court upheld an actual loss calculation that, like here, counted the net profit and loss on all terminated policies that had been fraudulently induced, without regard to the STOLI-related reasons providers would have rejected the polices. Further, this Court agreed with the government's exclusion of active policies, finding that "[t]he policies for which the results are already known are in that sense the only ones for which an 'actual' gain or loss to the insurer can be calculated." *Id.* at 598. However, like here, the *Binday* court included commissions for all policies (active or terminated). *Id.* at 597-98.

The district court here followed all aspects of the *Binday* court's calculation. PSR ¶¶ 172-173. If anything, loss calculation here was slightly tweaked "to make the calculation more accurate." PSR ¶ 172.

### 2. The loss calculation is consistent with other precedent.

Holding Carpenter culpable for all losses flowing from the policies issued based on his lies is in

---

that the review is for clear error. 804 F.3d at 597; *id.* at 598.

83

line with not just *Binday*, but also myriad other cases.

In *United States v. Jenkins*, 578 F.3d 745, 748 (8th Cir. 2009), for example, the defendant applied for insurance on the lives of others and misrepresented their background and heath histories, inducing insurers to issue coverage to people who were "otherwise uninsurable or who were only insurable at a higher premium." The court held that intended loss could be calculated by subtracting anticipated premiums from the total death benefits. *Id.* at 750. The court did not require an estimate of what the policies would have been worth absent the lies; instead, like here, it counted all losses that would flow from the issuance of each fraudulently induced policy.

Similarly, in *United States v. Bazemore*, 839 F.3d 379, 391 (5th Cir. 2016) (per curiam), the Fifth Circuit approved a loss calculation that included all commissions from a STOLI scheme, without subtracting out what the commissions would have been absent the lies. The court reasoned that "[t]he record demonstrates that insurers would not have issued the insurance policies but for Bazemore's misrepresentations of the applicant's net worth and intention to transfer the policy to an investor." *Id.*

This causation analysis is consistent with this Court's approach in non-insurance-related cases. In *United States v. Confredo*, 528 F.3d 143, 145-

84

46 (2d Cir. 2008), a loan broker fraudulently induced a bank to issue loans based on misrepresentations about the applicants' creditworthiness. In holding that intended loss is the value of the falsely induced loans less the intended repayments, the Court did not ask what losses might have occurred in the absence of the defendant's deceit, but rather what losses the victims suffered or were expected to suffer as a result of the fraudulently induced transactions. *See also United States v. Paul*, 634 F.3d 668, 676 (2d Cir. 2011) (where defendant fraudulently induced banks to make loans, actual losses included all losses flowing from the fact that loans were made); *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) (emphasizing, in mortgage fraud case, the need to hold defendants accountable for all foreseeable losses caused by their conduct, "to ensure that defendants who fraudulently induce financial institutions to assume the risk of lending to an unqualified borrower are responsible for the natural consequences of their fraudulent conduct" (quotation omitted)).

Nor has this Court limited its reasoning to STOLI and loan fraud cases. *See*, *e.g.*, *United States v. Borker*, 525 F. App'x 55, 59 (2d Cir. 2013) (counting known restocking fees as loss because "the customers paid [those fees] only as a result of their fraudulent inducement to purchase merchandise that was defective or counterfeit"); *United States v. Perez*, 528 F. App'x 319, 322-23

85

(2d Cir. 2013) (actual loss was the amount a defendant fraudulently induced from prospective adoptive parents, relying on the district court's analysis that "if they had known that this was going on they would not have given the defendant money").

### 3. Carpenter's alternative is foreclosed by *Binday* and otherwise unsupportable.

Carpenter criticizes the district court's refusal to adopt a so-called "alternative"—assessing loss based on the difference in lapse and funding rates in STOLI and non-STOLI policies—but the district court properly rejected this "alternative" calculation.

### a. The alternative was rejected in *Binday*.

Carpenter mistakenly claims that this Court's suggestion that there may be a better "alternative calculation for actual loss," *Binday*, 804 F.3d at 598, was an invitation to dispense with *Binday*'s causation test for fraudulent inducement cases. But this Court's invitation for an alternative addressed a different issue. In *Binday*, the defendant claimed that actual loss could not be determined until all policies were terminated, since otherwise the performance of the pool of policies was still contingent on when the remaining insureds would die or the policies would lapse. 804 F.3d at 596-97. However, this Court found that

86

the alternative proposed by the defendant—that the loss was zero—was not reasonable, and so ratified the government's proposal to exclude the active policies from the calculation absent a better alternative. *Id.* Nowhere did this Court suggest that the "better alternative" was meant to otherwise limit the losses that flowed from the fraudulently-induced policies.

In fact, Carpenter's supposed alternative was already argued unsuccessfully to this Court in *Binday*. GA589-GA592. Just like Carpenter, Binday argued that the government's loss formula was incorrect because it did not tie back to the "supposed differences between STOLI and non-STOLI policyholders[.]" *Id.* Binday claimed that "[n]o effort was made to demonstrate that the insurance companies suffered losses on the basis of [the STOLI-specific harms], because, most likely, they never did." *Id.* This Court ratified the government's loss calculation without reference to Binday's claim.

### b. The alternative misunderstands loss in "right to control" cases.

Carpenter's alternative improperly imports the economic reasons providers refused to accept STOLI (*e.g.*, minimum funding and lower lapse rates) into the loss calculation. In doing so, he conflates the guilt and sentencing phases of this case. At the guilt phase, "[i]t need not be shown that the intended victim of the fraud was actually harmed." A568 (internal quotations omitted)).

87

Rather, the government need only show that the defendant "den[ied] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." A569 (quoting *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998)). Accordingly, the district court found that "[t]he misrepresentations in the applications deprived the providers of information necessary to make discretionary decisions whether to issue the policies and created significant discrepancies between the benefits the providers reasonably anticipated from issuing the policies and the benefits they actually received." A645. The focus of the inquiry at the guilt stage is thus on the character of the misrepresentation—whether the information hidden, distorted, or falsified was important in some economic sense.

At sentencing, however, the question of whether the misrepresentations carried a risk of economic harm—if only through deprivation of control over economic decision-making—no longer governs the inquiry. The district court already answered that question "yes." Now the inquiry focuses on quantification of the losses that flowed from the fraudulent scheme. Having been induced to issue stealth STOLI policies based on misrepresentations that carry a risk of economic harm, the Guidelines look to the losses the providers suffered as a result of that inducement. Judge McMahon explained it well in the *Binday*

88

sentencing: "These are fraudulent inducement cases. These are policies that would not have issued absent the fraud. These are not cases about the spread between STOLI and non-STOLI. This is business that would not have been written." GA572; *see also* A1026.

### c. Carpenter's alternative distorts the facts of this case.

Carpenter's alternative incorrectly assumes that had the providers known at inception that the COT policies were STOLI, their reaction would have been to reprice to account for different lapse rates and funding patterns. The evidence showed that the providers would simply have refused coverage. *See*, *e.g.*, A583-A584, GA369, GA407, GA399.

Similarly, Carpenter falsely assumes that the providers *could* have sold an accurately-priced STOLI product. The evidence shows just the opposite. Pricing an insurance policy is "a fairly complicated process. [Phoenix] basically project[s] cash flows, revenues and expenses, over the course of 30 or more years typically." GA365. That experience does not exist for a pool of STOLI policies, as the providers were clear that they did not knowingly accept such business. The providers simply had no way to assess the risks that would be posed by STOLI business. *See* GA407-GA408. In short, Carpenter's alternative—that his victim must accept and try to value an asset

89

it did not want and that it was defrauded into taking—would be perverse.[10]

### d. Carpenter cites a number of unhelpful cases regarding proximate cause.

*First*, Carpenter cites several cases for the non-controversial principle that proximate cause is a common requirement in criminal and civil tort cases. Br. 71-72. However, even were this requirement grafted onto the Guidelines loss analysis, these cases do not provide guidance as to what constitutes a "sufficient connection" between cause and result to meet the definition of proximate cause. *Paroline v. United States*, 572 U.S. 434, 444 (2014) (calling "proximate cause" a "flexible concept" that "defies summary"). Even applying a "proximate cause" test, it was hardly clear error for the district court here to find that all losses from policies directly induced by Carpenter's lies should be included.

*Second*, Carpenter's evidence for a proximate cause requirement in the fraud Guidelines context provides no guidance here. Carpenter principally relies on a series of stock fraud cases, including *United States v. Ebbers*, 458 F.3d 110, 127 (2d

---

[10] This case stands apart from the civil case *Kramer v. Lockwood Pension*, 653 F. Supp. 2d 354, 379 (S.D.N.Y. 2009) in which there was there was no allegation that the applicant had made affirmative misrepresentations about the nature of the policy.

Cir. 2006) and *United States v. Rutkoske*, 506 F.3d 170, 180 (2d Cir. 2007), which held that in a fraud affecting a stock price, a court must attempt to isolate the fraud from other loss-causing factors. This approach is *not* appropriate where the defendant fraudulently induces a transaction—as in this case—that would not have occurred absent the fraud (rather than where it would simply have traded at a different price). *See Paul*, 634 F.3d at 676; *Turk*, 626 F.3d at 751. Carpenter's attempt to cabin these decisions to the "loan fraud scenario," Br. 74, misses three important points: his own precedent is limited to the stock fraud scenario; the facts of this case make clear that, like in *Confredo*, *Turk*, and *Paul*, and unlike in *Ebbers* and *Rutkoske*, the transactions would not have been made absent the lies; and this Court has already applied the government's causation analysis in the closest possible analogue, *Binday*.

*Third*, Carpenter asks this Court to overrule *Binday* based upon the unreported and distinguishable decision *United States v. Bazemore*, 608 F. App'x 207 (5th Cir. 2014), which concerned intended rather than actual loss. Although *Bazemore* involved a STOLI scheme, the sole theory of loss was that the defendant's lies induced carriers to pay large commissions. *Id.* at 212-213. There was no evidence that the defendant intended to profit from the policies themselves, and so the court rejected an intended loss calculation that included only the death benefit. *Id.* at 214.

91

At a minimum, the court explained, the death benefit would have to be offset by intended premiums. *Id.* Beyond that, the government would have to show that the defendant, who was apparently only interested in the commissions, "intended pecuniary harm to result from the scheme." *Id.* at 215. The evidence in *Bazemore* simply could not carry that burden.

Here, unlike *Bazemore*, the government showed that Carpenter intended that each policy would be profitable to him (or downstream purchasers) at the expense of the insurers. Carpenter's scheme was an arbitrage in which he leveraged his knowledge about the true nature of the policies in order to make money on *each* of the policies at the carriers' expense. A1024-A1025, GA312 (Carpenter: "our game is arbitrage against the carriers"). Indeed, if the district court had applied intended loss here—which it found was "certainly consistent with what Mr. Carpenter hoped would happen"—the loss would have been $194 million. A1024. This is the method approved in *United States v. Quatrella*, decided by this Court after *Bazemore* and citing to *Bazemore*. 722 F. App'x 64, 69 (2d Cir. 2018).

Carpenter also omits that on appeal after remand the Fifth Circuit approved a loss calculation that included *all* commissions, without subtracting what the commissions would have been if the truth had been told. In doing so, the court

92

explicitly adopted a "but for" analysis. *Bazemore*, 839 F.3d at 391.

*Fourth*, Carpenter's argument that commissions from active policies should have been excluded is foreclosed by *Binday*, which held that, regardless of whether a policy was active or terminated, "commissions defendants received constitute a loss to the insurers." 804 F.3d at 598.[11] Carpenter's suggestion that the carriers should have simply cancelled the policies is misleading, given the expense of litigation against current policy owners, who presumably would assert ignorance of the fraud that caused the policies to be issued. Depending on the jurisdiction, there are legal impediments to undoing a life insurance contract once the two-year contestability period has passed. Carpenter crafted his scheme to take into account this fact and ensure the contestability period would not interfere with his plans to resell. In any event, it is irrational to put the onus

---

[11] *Quatrella* does not augur for a different result. There, the district court had based its guidelines calculation on intended loss of approximately $15 million. 722 F. App'x at 68. To the extent that the court did not consider the commissions on one active policy, the government—as it acknowledged previously, GA586-GA587—simply had not put that information or argument in front of it, due to a defendant-benefitting misreading of *Binday* that was adopted in the plea agreement and adhered to by the government on appeal. 722 F. App'x at 67-68.

93

on victims to undo the harm caused by a criminal. *See United States v. Miller*, 962 F.2d 739, 744 (7th Cir. 1992); *United States v. Lutz*, 154 F.3d 581, 590 (6th Cir. 1998); *United States v. Agnew*, 171 F. App'x 376, 379 (2d Cir. 2006).

Moreover, although Carpenter claims now that the active policies are all "in the black," Br. 76, they would all be losses to the insurers if the insured died any time in the next few years. A807-A809, GA252-GA253. Indeed, the insurance companies were specifically concerned about selective lapsing by investors. GA371.

### 4. Any error was harmless.

Finally, any error was harmless. *See United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009). The district court—which sat through a six-week bench trial—made clear that the loss amount had no impact on the ultimate sentence in this case. The court explained: "But no matter what, all agree that this range is plainly excessive, and while it does have a framing effect or an anchoring effect, as a judge I'm going to ignore it just like I ignore inadmissible evidence in making findings and conclusions. I mean no disrespect to the guideline, but I'm putting it aside and I am addressing the 3553 factors without regard to the guideline." A1031. And the court's view was reinforced by its sentence—30 months of imprisonment where the range was approximately ten times more. Thus Carpenter cannot show he

94

would have received a lower sentence even if the court erred in its loss calculation.

## IV. The district court properly found that mail and wire fraud counts were within the statute of limitations.

### A. Relevant facts

Counts 1 through 32 of the superseding indictment charged Carpenter with mail and wire fraud. A239-A269. The charged mailings and wires—all occurring after August 9, 2008—fell into two categories: transmissions of false insurance applications and transmissions of money (or e-mails or mailings directing money transfers) to fund loans for or pay insurance premiums. *See id.*, A645-A646, GA256. The district court found that each of the mailings and wires was "in furtherance of the scheme." A645-A646.

After trial, Carpenter moved for acquittal under Fed. R. Crim. P. 29, arguing, in part, that the mail and wire fraud counts violated the statute of limitations. *See* A23, GA424-GA425, GA429-GA444. In an oral ruling, the district court denied the Rule 29 motion. GA499, GA506, GA508; *see* A27.

### B. Governing law and standard of review

The statute of limitations for mail and wire fraud is five years. *See* 18 U.S.C. § 3282. "The statute of limitations runs from the date of the charged mailing" or wire. *United States v. Eisen*,

974 F.2d 246, 263 (2d Cir. 1992); *see United States v. Rutigliano*, 790 F.3d 389, 401 (2d Cir. 2015) (wire fraud).

The "essential elements of" both offenses are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *Binday*, 804 F.3d at 569. The mailing or wire "need not be an essential element of the scheme. It is sufficient for the [mailing or wire] to be incident to an essential part of the scheme or a step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (internal citations and quotation marks omitted). Indeed, "'[i]nnocent' mailings—ones that contain no false information—may supply the mailing element." *Id.* at 715. Moreover, "[w]here the frauds are not isolated or unrelated swindles, postfraud mailings of invoices, checks, or receipts may further the scheme by, for example … by helping to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant." *United States v. Slevin*, 106 F.3d 1086, 1089-90 (2d Cir. 1996) (citations omitted).

In an appeal from a judgment after a bench trial, this Court reviews the district court's legal conclusions *de novo* and its factual findings for clear error. *United States v. Coppola*, 85 F.3d 1015, 1019 (2d Cir. 1996).

96

## C. Discussion

There is no dispute that in order to satisfy the statute of limitations, each of the mailings and wires had to occur after August 9, 2008, and in this case they did.[12] *See* Br. 87; GA256.

On appeal, Carpenter argues, as he did below, that his convictions on 28 of the 32 mail and wire fraud counts (Counts 2-19, 21-22, 24-25, 27-32) violated the statute of limitations and should be reversed. Br. 85-90. Specifically, he argues that the mailings and wires charged in those counts—the transfer of money for premium payments—were not in furtherance of Carpenter's scheme, and therefore cannot be used to satisfy the statute of limitations. Carpenter's arguments lack merit.

In its Verdict, the district court correctly found that each of the mailings and wires—including those related to premium payments— was "in furtherance of the scheme." A645-A646. The superseding indictment alleged and the trial evidence

---

[12] Carpenter agreed to toll the statute of limitations from August 9, 2013 to December 11, 2013. *See* GA187. The original indictment was returned on December 12, 2013, and the superseding indictment was returned on May 14, 2014. A7, A11. The mail and wire fraud counts in the superseding indictment are nearly identical to those in the original indictment, and therefore retain the same limitations period. *See* GA187; Br. 87 n.12; *Rutkoske*, 506 F.3d at 175.

97

showed that the premium payments furthered at least four objectives of Carpenter's scheme.

*First*, premiums were necessary to keep the policies in force in order to resell them for a profit following the expiration of the two-year contestability period, which was the primary objective of the scheme. A235-A236, A238, A566 ("The evidence establishes … that from the outset … Mr. Carpenter knew the policies were being procured for resale to investors after the two-year contestability period expired"), A592-595 (discussing how Carpenter would profit and Carpenter's memorandum to employees: "we do not get paid until if and when the deal is completed satisfactorily 25-30 months from now[,]" which the district court concluded was a reference to reselling the policies), A624-A632 (describing Carpenter's attempts to resell the policies).

That objective would be defeated if the premiums were not paid and the policies lapsed. *See* A564 ("policies do not expire as long as premiums are paid."), A577 (premiums "keep a policy in force."), GA362, GA402. If the policies were not in force after two years, Carpenter could not resell them and reap his profit. The premiums here "help[ed] to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant," *Slevin*, 106 F.3d at 1090.

98

*Second*, paying premiums was necessary to preserve the ongoing relationship with Ridgewood, which (1) provided a $35 million credit facility to fund premiums, including for new policies issued after August 9, 2008, (2) had a security interest in all of the COT policies, and (3) was to be repaid from proceeds from reselling policies, plus interest and fees. *See, e.g.,* A234-A237, A592-A593, A600-A601, GA257 (Ridgewood commitment letter to fund COT policy obtained after August 9, 2008), GA274 (same), GA289 (same). Without premium payments, the policies would have lapsed, Ridgewood's security interests would become worthless, its loan would not have been repaid, and it would have no reason to fund new COT policies, thereby ending the scheme. As the district court found, "[r]epaying Ridgewood's loan was essential to completing the scheme and helped promote Ridgewood's continued involvement as a source of funding for fraudulent applications." A650.

*Third*, premium payments were necessary for the collection of millions of dollars in commissions, another objective of the scheme. *See* A238, A576, A588 (Carpenter "mandated that TPG [Group][13] receive 40 percent of the commission"), GA368 (commissions based on first and second year premium payments), GA411 (same). Again,

---

[13] TPG Group was a Carpenter-controlled entity that collected commissions. *See* A586-A588, A618.

this objective—which resulted in the carriers paying Carpenter and his co-conspirators over $12 million in commissions in the first year alone—would have been defeated if the premiums were not paid. *See* GA254-GA255 (summary chart of first-year commissions to TPG Group on COT policies).

*Fourth*, the mass cessation of premiums would have raised red flags, effectively ended the COT's relationship with carriers, and prevented the origination of new COT policies. Thus, premiums were necessary to keep the scheme going and avoid detection by the carriers. *See Slevin*, 106 F.3d at 1090.

Carpenter's arguments to the contrary all fail. Carpenter erroneously claims that the scheme was complete as soon as a STOLI policy was issued. But the scheme was an *ongoing* scheme whose objectives included reselling the policies after two-years and earning commissions, all of which would have been defeated if premiums were not paid. Moreover, as part of the ongoing scheme, Carpenter and his co-conspirators continued to procure new policies through December 2009. *See* A624 (noting that 16 COT policies were issued in 2009), GA252-GA253. The carriers would not have issued new COT policies if Carpenter stopped paying premiums on all of the prior policies.

Carpenter's reliance on *United States v. Grimm*, 738 F.3d 498 (2d Cir. 2013), is misplaced.

100

First, whereas in *Grimm* GE's payments at de-
pressed interest rates were "lengthy, indefinite,
ordinary, typically noncriminal and unilateral,"
*id.* at 502, and thus not in furtherance of the con-
spiracy, here the premiums were necessary to
permit resale after two years; the payments were
not indefinite but contemplated to end as soon as
Carpenter could sell the policies after the contest-
ability period; the payments were not unilateral,
but involved the coordinated effort of several co-
conspirators, including Ridgewood; and the third-
party funding of premiums was not "typically
noncriminal," but rather the very thing that Car-
penter was concealing.

Second, unlike in *Grimm*, Carpenter and his
co-conspirators continued to deceive the carriers
into issuing new policies through December 2009
and executed other aspects of the scheme within
the statute of limitations. *See* A624-632, GA252-
GA253. During the limitations period, Carpenter
and his co-conspirators responded to the carriers'
concerns about the COT with false information or
by withholding critical information that would
have revealed the true STOLI-nature of the COT.
*See, e.g.,* A620-A624, GA383-GA395, GA247-
GA249 (Gov't Exs. 2147, 2154, and 2208 were
dated after August 9, 2008).

Thus, unlike in *Grimm*, here there was evi-
dence that "concerted activity posing the special
societal dangers of conspiracy [was] still taking
place." 738 F.3d at 502. Indeed, as Carpenter

101

acknowledges, *see* Br. 89, this Court later distinguished *Grimm* in *Rutigliano*, and found the concerns of *Grimm* were not present where the defendant and his co-conspirators—like here—had "engaged, within the limitations period, in 'measures of concealment' and 'other corrupt intervention.'" *Rutigliano*, 790 F.3d at 400-401 (quoting *Grimm*, 738 F.3d at 503) (finding in *Rutigliano* that where some fraudulently induced benefits had already been received, subsequent mailings were in furtherance of the fraud because they were required to "secure continued payments"). Finally, *Grimm* considered only the timeliness of an overt-act conspiracy, not the timeliness of substantive counts of mail and wire fraud.

Carpenter's reliance on *United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989) further undermines his argument. In *Doherty*, the First Circuit actually upheld the convictions of two of the three defendants, and found that the continued receipt of salary payments fell within the limitations period because the payments—like the premium payments here—took place while "concerted activity posing the special societal dangers of conspiracy [was] still taking place." *Id.* at 61-62.

Accordingly, the district court properly determined that each of the mailings and wires—including those related to premium payments—

102

was "in furtherance of the scheme," and therefore, was within the statute of limitations.

## V. The district court did not plainly err by finding Carpenter guilty of money laundering and illegal monetary transactions based on transactions involving the Spencer death benefits.

### A. Relevant facts

Counts 34 through 57 of superseding indictment charged Carpenter with promotion money laundering, illegal monetary transactions, and conspiracy to commit those offenses. *See* A270-A283. Those counts were premised on Carpenter's use of $30 million in death benefits that Lincoln paid on two COT insurance policies on the life of Sash Spencer, who died within the two-year contestability period. *Id.*, A632-A642, A648-A653.

Lincoln issued the two Spencer policies in reliance on lies in the policy applications similar to those in every other COT policy application. A605-A614, A632-A633.

After Spencer died, Carpenter directed the filing of death claims. A633. Lincoln then investigated pursuant to its regular practice. A633-A634. Despite Lincoln's requests, Carpenter withheld documents that would have revealed the STOLI-nature of the COT and would have caused Lincoln to deny the claims. A634. Once Lincoln paid the $30 million to the COT, Carpenter wrote to Bursey: "Big day for all of us … check mail and

103

speak only to me…. May you be in heaven before the Devil knows you're dead." A634-A635.

Instead of paying the death benefit to Spencer's beneficiary, the charity Universitas Education, Carpenter stole the money. First, he revised the COT trust document to reflect a 20% holdback that had not previously existed. A635-A637. Beyond that, Carpenter concocted specious reasons to deny Universitas's claim entirely, and kept the entire amount after Ridgewood's funding was repaid. A637-A638. Carpenter then invested some of the death benefit proceeds back into the COT, and used over a million dollars to buy a Rhode Island beach house. A638-A642.

In convicting Carpenter of money laundering, illegal monetary transactions, and conspiracy, the court concluded that the Spencer death benefits constituted the "proceeds of 'specified unlawful activity'" and "criminally derived property." A648-A654.

## B. Governing law and standard of review

As relevant here, the promotion money laundering statute makes it a crime to conduct "a financial transaction which in fact involves the proceeds of specified unlawful activity … with the intent to promote the carrying on of a specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i). The illegal monetary transactions statute makes it a crime "to engage in a monetary transaction in criminally derived property of a value greater

104

than $10,000 and is derived from specified unlawful activity[.]" § 1957(a).

Under both statutes, "specified unlawful activity" ("SUA") includes violations of the mail and wire fraud statutes. §§ 1956(c)(7)(A), 1957(f)(3), 1961(1). The term "proceeds" means "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity. §§ 1956(c)(9), 1957(f)(3). The term "criminally derived property" means "any property constituting, or derived from, proceeds obtained from a criminal offense[.]" § 1957(f)(2).

Ordinarily, following a bench trial, this Court reviews the district court's legal conclusions *de novo* and its factual findings for clear error. *Coppola*, 85 F.3d at 1019.

However, where an argument is not raised below, this Court reviews for plain error. *See United States v. Marcus*, 560 U.S. 258, 262 (2010). When a defendant raises specific grounds in a Rule 29 motion in the district court, arguments that are not raised in the motion are reviewed for plain error. *See United States v. Delano*, 55 F.3d 720, 726 (2d Cir. 1995); *United States v. Tagliaferri*, 648 F. App'x 99, 101 (2d Cir. 2016).

Under the plain error standard, "an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is

105

clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Marcus*, 560 U.S. at 262 (citations and quotations omitted).

## C. Discussion

On appeal, Carpenter argues that the Spencer death benefits were not proceeds of an SUA or criminally derived property because (1) the charged scheme was not one to obtain death benefits on fraudulent terms, and (2) the risk of paying death benefits was a risk the carriers took on with full and accurate information. Br. 90-93.

In his Rule 29 motion, Carpenter challenged the money laundering and illegal monetary transaction counts, claiming principally that (1) the Spencer death benefits were not proceeds of SUA because the government did not prove an SUA, and (2) the purpose of the financial transactions was not to conceal the origin or nature of the proceeds. GA425, GA445-GA554. But he did not raise the arguments that he now raises on appeal. *See id*. As such, he has forfeited these arguments, and they are reviewed for plain error. However, regardless of the standard of review, Carpenter's arguments lack merit.

106

## 1. The Spencer death benefits constitute "proceeds" of the fraud.

The district court properly concluded that the Spencer death benefits were "proceeds of SUA" and "criminally derived property." A648-A649, A652. It found "overwhelming evidence" that Carpenter engaged in a mail and wire fraud scheme "to use material misrepresentations to induce the life insurance providers to issue policies they would not have issued" had they known about the STOLI-nature of the policies. A573, A643, A647. It also found that the Spencer policies were procured by that fraudulent scheme. *See* A648, A650-A651. Therefore, the death benefits paid on those policies were "derived from" or "obtained[,] … directly or indirectly, through" the scheme, thereby making them "proceeds" of SUA and "criminally derived property." §§ 1956(c)(9) (defining "proceeds"), 1957(f)(2) (defining "criminally derived property"); *cf. United States v. Afriyie*, No. 17-2444, __ F.3d__, 2019 WL 2909164, at *8 (2d Cir. July 8, 2019) (interpreting phrase "derived from" in forfeiture statute, and holding that forfeitable property extends to the appreciation of funds acquired through illegal scheme).

Moreover, even under Carpenter's theory that the scheme was complete once the policies were issued, Br. 87-88, the Spencer policies themselves constituted "proceeds" of the scheme. *See United States v. Estacio*, 64 F.3d 477 (9th Cir. 1995) (holding that "proceeds" can include tangible or

107

intangible assets). Therefore, the death benefits paid on those proceeds, by definition, constitute "criminally derived property" because they are "property … derived from … proceeds[.]" § 1957(f)(2).

Accordingly, the district court properly found Carpenter guilty of money laundering and illegal monetary transactions based on transactions involving the Spencer death benefits.

## 2. Carpenter's challenges are baseless.

*First*, Carpenter erroneously contends that the charged scheme was not one to obtain death benefits on fraudulent terms. Br. 90-93. Carpenter overlooks the allegations in the superseding indictment and the district court's findings, which plainly demonstrate that (1) an essential part of Carpenter's scheme was collecting death benefits on the fraudulent policies if an insured died within the first two years, which then would be used to repay Ridgewood, and (2) the scheme contemplated that Carpenter and others would profit from those death benefits. *See, e.g.,* A234 (insureds had no obligation to repay premiums, which would be repaid from sale proceeds or policy death benefit), A236 (same), A242 (insured's beneficiary would receive death benefit less repayment of premiums and fees if insured died within two years), A267 (same), A605 (insureds were "told that if they died during the two-year period, the policy proceeds would be disbursed to

108

their beneficiaries."), A650 ("Repaying Ridge-wood's loan was essential to completing the scheme[.]"). Because Carpenter's scheme contemplated obtaining death benefits, the district court properly considered them proceeds of the scheme.

*Second*, Carpenter erroneously claims that the risk of paying death benefits was a risk the carriers took on with full and accurate information. Br. 90-93. But the evidence showed that the carriers did not want STOLI policies and asked application questions to avoid them. A573-A584. Carpenter and his co-conspirators falsely answered those STOLI-related questions on all the applications, including the Spencer applications. A605-A618, A632-A633. They lied about the policies' purpose, the source of premiums, the intent to resell the policies, third party interests in the policies, and financial inducements. A605-A618, A632-A633. Four insurance company representatives, including two Lincoln representatives, testified that they would not have issued COT policies if they knew they were STOLI or originated for purposes of resale. *See, e.g.*, GA369, GA379, GA403, GA418.

Based on this evidence, the district court correctly concluded that Carpenter's scheme sought to induce carriers to issue policies they would have refused had they known the policies were intended for resale. *See* A606, A647. Thus, Carpenter cannot say that the carriers assumed the risk of paying the death benefits on STOLI policies

109

based on full and accurate information when the carriers did not want such policies, they took great measures to avoid them, and Carpenter and his co-conspirators lied on the application questions intended to detect STOLI.

Carpenter argues there were no lies about the age and health of the insureds, or anything related to their mortality, and therefore carriers assumed the risk of paying death benefits.[14] Br. 92. Carpenter misses the mark: carriers would not have issued the policies had they known the true source of funding and/or motivations for obtaining the policies; therefore, they did not assume the risk. As this Court noted in *Binday*, the factfinder—here the district court—could "infer that questions asked by an insurer about the insured's characteristics, including his economic status and motivations for taking out the policy, are asked— just like questions about age and health—not out of idle curiosity, but because they are material to the insurer's underwriting decision concerning *whether … to issue the policy*[.]" 804 F.3d at 576 (emphasis added). In this case, no inference was necessary because insurance company representatives made clear they would not have assumed

---

[14] Carpenter's argument also relies on the false premise that questions about age and health are the only questions related to an insured's likelihood to die. *But see Binday*, 804 F.3d at 573 (discussing correlation between life expectancy and wealth); *see also* A229, A611-A613, GA372, GA414-GA415.

110

the risk for paying death benefits had the STOLI-related questions been answered truthfully.

Carpenter's reliance on *United States v. Jenkins*, 578 F.3d 745 (8th Cir. 2009) is misplaced. *Jenkins* calculated intended loss in a STOLI-scheme as death benefits less intended premiums. *Id*. at 750. While "many" of the applicants were in poor health, it is unclear how many. *Id.* Under Carpenter's argument, the court in *Jenkins* should have calculated the difference between the profitability of policies with and without the defendant's health-related lies. Instead, the court held that the intended loss included the death benefits from *all* of the ill-gotten policies. Similarly here, "proceeds" are not limited to death benefits from applications with health-related lies; "proceeds" include death benefits from all STOLI policies.[15]

Likewise, Carpenter's reliance on *Kramer*, 653 F. Supp. 2d at 379 is also misplaced. As discussed above, *supra* n.10, the insurance applications in

---

[15] Carpenter's reliance on *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126 (2d Cir. 2018) is also misplaced. *AEI* was principally a choice-of-law case in which—unlike here—Lincoln conceded it was not cheated of premiums for the one policy at issue. *Id.* at 130 n.2. Neither Lincoln nor this Court made any general findings attributable to all STOLI policies. *Id.* Here, a Lincoln representative testified that STOLI policies result in "Lincoln receiv[ing] less premiums" than expected. GA412-GA415.

111

*Kramer* did not ask questions about the true owner or eventual beneficiary of the policy, and therefore there was no allegation that the applicant misrepresented the nature of the policy. 653 F. Supp. 2d at 379. Thus the carrier's damages were not caused by misrepresentations, but were always part of the bargain. *Id.* Not so here, where the carriers asked for the information, Carpenter lied, and carriers issued policies they would not have otherwise. Thus, unlike in *Kramer*, the risk of paying death benefits on STOLI policies was not part of the bargain.

Finally, even if this Court determines that Carpenter's scheme did not contemplate obtaining death benefits or that the carriers assumed the risk, this Court should apply a "but-for" test and find that the death benefits were proceeds of Carpenter's fraud. Although there does not appear to be a reported case from any circuit discussing the use of a "but-for" test in the money laundering context, courts have employed a "but-for" test in the analogous forfeiture context. *See United States v. DeFries*, 129 F.3d 1293, 1313 (D.C. Cir. 1997) (adopting "but for" test for determining whether property is "acquired or maintained" through racketeering activity or "derived from[ ] any proceeds ... obtained, directly or indirectly from racketeering activity."); *United States v. Coffman*, 859 F. Supp. 2d 871, 875 (E.D. Ky. 2012) ("Proceeds of a fraud is defined as 'property that a person would not have but for the criminal

112

offense.'" (quoting *United States v. Nicolo*, 597 F. Supp. 2d 342, 346 (W.D.N.Y. 2009)); *cf. United States v. Porcelli*, 865 F.2d 1352, 1365 (2d Cir. 1989) (requiring "but for" test for forfeitable proceeds in RICO case). Applying such a test here, Carpenter would not have obtained the death benefits but for the SUA, and therefore, they are "proceeds of the SUA" and "criminally derived property."

Accordingly, the district court did not commit any error—let alone plain error that was "clear or obvious, rather than subject to reasonable dispute"—by finding Carpenter guilty of money laundering and illegal monetary transactions based on transactions involving the Spencer death benefits. *Marcus*, 560 U.S. at 262 (citations and internal quotations omitted).

113

## Conclusion

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated: July 23, 2019

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY

NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY

Sandra S. Glover
Assistant United States Attorney (of counsel)

114

## Federal Rule of Appellate Procedure 32(g) Certification

This is to certify that the foregoing brief complies with this Court's order authorizing a brief of no more than 24,000 words, in that the brief is calculated by the word processing program to contain approximately 23,941 words, exclusive of the Table of Contents, Table of Authorities, Addendum, and this Certification.

DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY

Addendum

**U.S. Const. Amend. IV**

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**18 U.S.C. § 1956**

(a)

(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)

(i)  with the intent to promote the carrying on of specified unlawful activity; …

\*\*\*

(c) As used in this section—

\*\*\*

(9) the term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful

Add. 1

activity, including the gross receipts of such activity.

**18 U.S.C. § 1957**

(a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

\*\*\*

(f) As used in this section—

\*\*\*

(2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and

(3) the terms "specified unlawful activity" and "proceeds" shall have the meaning given those terms in section 1956 of this title.

Add. 2

**18 U.S.C. § 3161**

\*\*\*

(c)

(1) In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

\*\*\*

(h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:

(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—

\*\*\*

(D) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion; [and]

Add. 3

(H) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

(6) A reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted.

(7)

(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of

Add. 4

the public and the defendant in a speedy trial.

(B) The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:

(i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

(ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

\*\*\*

(iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the

Add. 5

Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

**18 U.S.C. § 3162**

(a)

\*\*\*

(2) If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant. The defendant shall have the burden of proof of supporting such motion but the Government shall have the burden of going forward with the evidence in connection with any exclusion of time under subparagraph 3161(h)(3). In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice. Failure of the defendant to move for dismissal prior to trial or entry of a

Add. 6

plea of guilty or nolo contendere shall consti-
tute a waiver of the right to dismissal under
this section.

## D. Conn. Loc. R. Civ. P. 7

\*\*\*

(b) Motions for Extension of Time

2. … Agreement of the parties as to any ex-
tension of time does not by itself extend any
time limitation or provide good cause for
failing to comply with a deadline estab-
lished by the Federal Rules of Civil Proce-
dure, these rules, or the Court.

## D. Conn. Loc. R. Crim. P. 1

\*\*\*

(c) Applicability of Local Civil Rules

The following Local Civil Rules shall apply in
criminal proceedings: … (7)(b) (Motions for Ex-
tension of Time) …

Add. 7